Mollie T. SHOUSE, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

2012–SC–000663–MR

Supreme Court of Kentucky.

RENDERED: SEPTEMBER 24, 2015

Rehearing Denied March 17, 2016

Counsel for Appellant: Joseph R. Eggert, 600 West Main Street, Suite 300, Louisville, Kentucky 40202, Michael L. Goodwin, 600 West Main Street, Suite 100, Louisville, Kentucky 40202.

Counsel for Appellee: Jack Conway, Attorney General, Dorislee J. Gilbert, Special Assistant Attorney General, 514 West Liberty Street, Louisville, Kentucky 40202.

OPINION OF THE COURT BY
JUSTICE NOBLE

Appellant, Mollie T. Shouse, was convicted of wanton murder, second-degree criminal abuse, and first-degree wanton endangerment of her two-year-old son who died when she left him in her car overnight and into the afternoon. She was also convicted of possession of a controlled substance; she has not appealed that conviction. While her conduct would have historically supported a conviction for wanton murder, since it evinces aggravated wantonness resulting in a death, it cannot support such a conviction now. In 2000, the General Assembly amended the homicide statutory scheme to create a new type of second-degree manslaughter applicable to circumstances such as these. Because the legislature has created a crime specifically applicable to such circumstances, it has created a carve-out, and such conduct will no longer support a conviction for wanton murder. For that reason, Shouse's conviction for wanton murder must be vacated. This Court also reverses her conviction for first-degree wanton endangerment, as set forth below. Her conviction for second-degree criminal abuse is affirmed.

## I. Background

On May 21, 2011, Shouse took a Xanax mid-afternoon, and then dropped her two-year-old son off at her mother's while she went shopping with a friend. At about eight in the evening, she retrieved her son and went to their apartment where she took a second Xanax. A friend stopped by at about 10:30 p.m. and stayed until about 12:30 a.m., when Shouse drove the friend to Jeff Burch's apartment to obtain marijuana. She then drove Burch to a nearby Waffle House and back to his apartment, where they sat in the car and talked for about an hour. Burch gave her some marijuana, but both claim they did not smoke it at that time. At about 3:00 a.m., Shouse drove to a Thornton's, bought doughnuts and a drink, and then went home. She got several items out of the car, went inside, and fell asleep. She left her son in the car.

Burch and others tried to contact Shouse until about 3:00 p.m. the next day, when her mother went to the apartment to check on her and the child. Shouse, who appeared startled and confused, did not know where her son was. The grandmother ran to the car where the child was still strapped in his car seat. He was pronounced dead at the scene. A search of the apartment revealed a number of drugs. Shouse was charged with murder, criminal abuse and wanton endangerment.

At trial, the jury was instructed on wanton murder and, as a lesser included offense, second-degree manslaughter. The

jury was also instructed on second-degree criminal abuse, first-degree wanton endangerment, and first-degree possession of a controlled substance (oxycodone). The jury convicted Shouse of wanton murder, criminal abuse, wanton endangerment and possession of a controlled substance. The trial court imposed a total sentence of 35 years.

Shouse now appeals to this Court as a matter of right. *See* Ky. Const. § 110(2)(b).

## II. Analysis

**A. Second-degree manslaughter, under the specific facts in KRS 507.040(1)(b), precludes a charge of wanton murder.**

█ Shouse's first issue on appeal is whether she could be convicted of wanton murder under the facts of this case. She contends that KRS 507.040(1)(b), which was added to the second-degree manslaughter statute in 2000, specifically provides that causing the death of a child under the age of eight by leaving the child in a motor vehicle under circumstances manifesting an extreme indifference to human life and creating a grave risk of death, is second-degree manslaughter. Thus, she argues, the statutory amendment preempts a conviction for wanton murder on those facts. Her contention is correct. The plain language of the amendment can only mean that the legislature intended to limit the charge under such circumstances.

Before 2000, KRS 507.040(1) read, "A person is guilty of manslaughter in the second degree when, including, but not limited to, the operation of a motor vehicle, he wantonly causes the death of another person." In 2000, the statute was amended to read as follows:

A person is guilty of manslaughter in the second degree when he wantonly causes the death of another person, including, but not limited to, situations where the death results from the person's:

(a) Operation of a motor vehicle; or

(b) Leaving a child under the age of eight (8) years in a motor vehicle under circumstances which manifest an extreme indifference to human life and which create a grave risk of death to the child, thereby causing the death of the child.

KRS 507.040(1)(b).

The purpose of the amendment was "to provide explicitly for homicide coverage of the situation where a person leaves a child under 8 years of age in a motor vehicle and in so doing causes its death." Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law* § 8.4(a), at 31 (2006 supp.). Professors Lawson and Fortune have suggested that in passing this statute, the General Assembly "was almost surely trying to provide for criminal liability that it believed not to exist, motivated by publicity about recent instances in which small children have suffered death or serious physical injury from being left in sun-heated vehicles." *Id.* But, they noted, the General Assembly "almost surely acted erroneously in believing that there was under the preexisting statute no basis for liability of such conduct." *Id.* They point out that a person could have been convicted under the prior second-degree manslaughter statute, stating "a person leaving a child in a dangerous situation (such as unattended in a sun-heated car) could have been convicted upon a showing that he/she had acted wantonly (consciously disregarding the risk) in causing the death." *Id.*

While this view may be the most logical, it is also possible the legislature viewed death of a child under these circumstances as, on at least some occasions, having ele-

ments of negligence that mitigate the criminal nature of the act, such as when a parent who did not usually take a child to the sitter, being distracted by getting to work, forgets to drop the child off and leaves the sleeping baby in the car seat. While nonetheless reprehensible, the grief and self blame that follows such conduct could be viewed as strong punishment that calls for a lesser criminal offense than murder.

Whatever the motivation behind the statutory change, the legislature clearly placed wantonly causing the death of a child under the age of eight by leaving the child in a vehicle under circumstances manifesting extreme indifference to life, and with grave risk of death that results in death, in the second-degree manslaughter statute. And the legislature included a mental state not normally associated with that offense: aggravated wantonness. This heightened mental state, deliberately inserted into the second-degree manslaughter statute, makes the proof more difficult for the Commonwealth in these cases, and supports the theory that the legislature intended a lesser offense when the child's death occurs in this fashion.

Perhaps *both* motivations were at work, but ultimately it does not matter. The statutory language is clear: when the death of a child under eight is wantonly caused by leaving the child in a vehicle with extreme indifference to life and grave risk of death that results in death, those facts create the offense of manslaughter second degree and no other.

Rather than charging Shouse under this new provision, however, the Commonwealth instead charged her under the wanton murder statute, KRS 502.020(b), and

ultimately obtained a conviction for murder. This was error.

Wanton murder, KRS 502.020(b),[1] and second-degree manslaughter under KRS 507.040(1)(b) have the same mental state. Both offenses require proof of wanton conduct under circumstances manifesting extreme indifference to human life and creating a grave risk of death that results in the death of a victim. As noted above, the requisite mental state is often "described as 'aggravated wantonness,'" *Hurt v. Commonwealth*, 409 S.W.3d 327, 331 (Ky. 2013) (quoting *Graves v. Commonwealth*, 17 S.W.3d 858, 863 (Ky.2000)), to distinguish it from mere wantonness.

There is thus little question that evidence sufficient to convict under the amended provision of KRS 507.040(1)(b) would also support a conviction for wanton murder, *if* that statute applied to the conduct in question. *See* Lawson & Fortune, *supra*, § 8.4(a), at 31 ("What this means, of course, is that proof that is sufficient for a manslaughter conviction under KRS 507.040[ (1)(b) ] is at the same time sufficient for a wanton murder conviction under KRS 507.020(b)."). There is no ambiguity here; both statutes, by their plain language, apply to Shouse's conduct.

But that creates a conflict in the statutes, because it is not obvious which one applies and should prevail over the other to establish an offense under these circumstances, which is not to say an *option* is created. The same mental state—aggravated wantonness—is being applied to two different homicide offenses—murder and second-degree manslaughter—when one is a greater offense than the other. This is outside the normal view of how offenses

---

1. "A person is guilty of murder when, ... [i]ncluding, but not limited to, the operation of a motor vehicle under circumstances manifesting extreme indifference to human life, he wantonly engages in conduct which creates a grave risk of death to another person and thereby causes the death of another person." KRS 507.020(1)(b).

work, where the greater offense *includes* the lesser offense, and the offenses are usually differentiated by the mental state. Obviously, that cannot occur when the mental state of aggravated wantonness and the end result of death are the same for the two different offenses. But both statutes cannot control, nor can Shouse's conduct have violated both. She can be convicted of only one homicide offense.

The question, then, is how does this Court resolve the conflict between the statutes? This Court concludes that by tying the aggravated wantonness in the second-degree manslaughter statute to a very specific set of facts—death of a child under eight wantonly left in a vehicle—the legislature made a clear distinction from the murder statute. A death that happens this way is *not* murder, but is rather second-degree manslaughter.

This Court cannot assume the General Assembly enacted a nullity when it amended the manslaughter statute. Ordinarily, as noted above, homicide with a mental state of aggravated wantonness is murder, whereas homicide with a mental state of wantonness is second-degree manslaughter. And, again ordinarily, second-degree manslaughter is a lesser included offense of wanton murder, meaning that if the evidence would allow a reasonable jury to choose between the two mental states, it should be allowed the opportunity to do so. But by amending the second-degree manslaughter statute to cover an aggravatedly wanton homicide of a child under age eight by leaving the child in a car, the legislature has carved out a specific fact pattern for which second-degree manslaughter is the highest possible offense committed. The fact that the legislature set forth the specific conduct to be treated as second-

degree manslaughter is indicative that there is an intentional difference and that one statute should control over the other.

■■ And KRS 507.040(1)(b) is more specific than the wanton-murder statute. It specifically applies *only* when the death is caused to a *child* (under age 8) by *leaving the child in a motor vehicle.* While these same facts could also be covered by the wanton murder statute, which is broad and does not limit its applicability, the very fact that the circumstances of these cases are specifically described in KRS 507.040(1)(b) distinguishes the offenses. As this Court has noted on repeated occasions when resolving conflicts in statutes, "the more specific statute controls over the more general statute." *Light v. City of Louisville,* 248 S.W.3d 559, 563 (Ky.2008). We have also noted that in dealing with conflicts in criminal statutes, "the 'rule of lenity' is applicable." *Commonwealth v. Lundergan,* 847 S.W.2d 729, 731 (Ky.1993). Though it is not the first canon of interpretation a court should turn to, when resort is had to it, the rule of lenity requires a conflict in a statutory scheme "to be resolved in favor of a criminal defendant." *White v. Commonwealth,* 178 S.W.3d 470, 484 (Ky.2005). Thus, facts which exactly match the language in the statute can only give rise to that specific offense, as is the case here.[2]

Ultimately, there is a conceptual difference between the two statutes. If the legislature intended a homicide under these facts to be a wanton murder, it had only to leave the murder statute as written or to add more specific language to the wanton-murder section of the statute. But the legislature chose to designate the specific acts relating to a child's death from

---

2. This is not to suggest that the accused would not be entitled to an instruction on reckless homicide as a lesser included offense

if the accused's mental state rose only to the level of recklessness. Due process would require such an instruction.

being left in a car as a lesser homicide, specifically manslaughter in the second degree rather than wanton murder.

That the legislature intended a homicide under these circumstances to be at most second-degree manslaughter is also shown by the fact that the mental state necessary to obtain a conviction under the new provision is *aggravated* wantonness, the same mental state required for wanton murder. In so doing, the legislature has actually "ma[d]e prosecution of such a person more difficult than it would otherwise have been." Lawson & Fortune, *supra*, § 8-4(a), at 31. This is because "under the modified statute, after proving the defendant acted wantonly, the prosecution will have to show that the circumstances manifested extreme indifference to human life and created a grave risk of death, proof that would have been sufficient before the amendment to support a conviction of wanton murder under KRS 507.020(b)." *Id.*

Arguably, this was because the legislature perceived the degree of culpability for such homicides to be less than for wanton murder, and set a maximum limit of second-degree manslaughter accordingly. Rather than over-criminalizing what is inevitably a tragic situation, while also recognizing the need for some, albeit lesser, culpability, the legislature both created a new form of manslaughter in the second degree and increased the burden of proof needed to make that showing.

But the common mental state in the wanton murder and second-degree manslaughter statutes has created some confusion, and has led some to believe, that the amendment to the manslaughter statute gives the Commonwealth an *option* as to which offense to charge. In other words, the argument is that the statutes both apply, and a prosecutor may elect to charge either wanton murder or second-degree manslaughter in cases like this.

Allowing the prosecution to elect charges, however, does not make sense for a number of reasons.

If KRS 507.040(1)(b) is treated as an option under which the Commonwealth may elect to proceed, then the prosecutor is in the position of arbitrarily deciding who gets charged with murder and who gets charged with manslaughter second degree *based on the same mental state.* This could create the worst form of selective prosecution being wholly dependent on personal choice, sympathy for a defendant, political reasons, or personal animus. But the legislature did not give the prosecution this choice. In a case where the death of a child under eight is caused by leaving the child constrained in a vehicle with a mental state of aggravated wantonness, the charge is, by the clear language of the statute, second-degree manslaughter.

For a prosecutor to charge a defendant with murder instead of second-degree manslaughter under the facts of this case was contrary to the mandate of the second-degree manslaughter statute. While it is obvious that it is more difficult to obtain a second-degree manslaughter conviction under this specific scenario (than it would be for a simple wanton mental state), and that a prosecutor may think that if he has to prove aggravated wantonness there *should* be a murder conviction, the legislature has exercised its authority to decide otherwise in this very narrow class of cases.

The effect of making the route of prosecution "optional" on the exact facts as stated in the second-degree manslaughter statute is to ensure arbitrary and selective prosecution.

And, as noted above, it must be presumed that the legislature does not act to create a nullity. If KRS 507.040(1)(b) is

treated as an option under which the Commonwealth may elect to proceed, then the Commonwealth could simply seek a conviction for wanton murder in every case where there is an aggravated-wantonness mental state, even in the presence of the specific statutory factors in the second degree manslaughter statute, and thereby make those factors meaningless. If prosecuting under KRS 507.040(1)(b) is optional, then a prosecutor could easily evade it, despite its specificity.

This would ignore the specific nature of the charge set forth in KRS 507.040(1)(b) creating the nullity we must presume the legislature did not intend. If the statutory amendment in 2000 means only that Commonwealth's Attorneys can choose to pursue the lesser charge of second-degree manslaughter, at their option, then it did nothing, because they already could do that. If it means that the jury is instructed on second-degree manslaughter as a lesser included offense, then again it was a nullity because the jury could already receive that instruction.

Indeed, this case illustrates exactly how the amended manslaughter statute can be nullified if it allows a prosecutorial election and treats manslaughter as a lesser included offense of wanton murder. In its jury instructions, the trial court laid out second-degree manslaughter under KRS 507.050(1)(b) as a lesser included offense of wanton murder, which is facially reasonable because manslaughter is usually a lesser included offense and carries a lesser penalty. Thus, the court instructed the jury to first consider the elements of wanton murder. If the jury found guilt under that instruction, it was to return a verdict of *guilty* and ignore the manslaughter instruction, despite the presence of the statutory qualifying factors. The jury was to consider the manslaughter instruction only if it found Shouse not guilty under the wanton-murder instruction. The manslaughter instruction listed the child's age and death in the car, along with aggravated wantonness, as elements of second-degree manslaughter.

But if the jury found Shouse *not guilty* under the murder instruction, it could not, as a matter of law, find her guilty under the manslaughter instruction, as that offense, under these circumstances, has the *same* basic mental state as wanton murder. In other words, under these instructions, the jury could *never* find Shouse guilty of second-degree manslaughter because a finding that she was not guilty of wanton murder (i.e., homicide with aggravated wantonness) would necessarily be an acquittal of second-degree manslaughter under KRS 507.040(1)(b) (i.e., homicide with aggravated wantonness). (The jury was not instructed on ordinary second-degree manslaughter (i.e., merely wanton conduct), as an alternative lesser included offense.)

As noted above, treating the statute as creating an optional election of charges or offenses is arbitrary. There is nothing to guide a prosecutor's decision in choosing between wanton murder and second-degree manslaughter. Both offenses are shown by the same mental state (aggravated wantonness) and the same forbidden result (a death). No doubt, prosecutors have discretion in choosing whether to charge and what to charge (though ultimately, the grand jury has much to say on both subjects), but that discretion is not unlimited and cannot depend on the figurative flip of a coin.

This case does not raise the question of whether Shouse *deserves* to face a murder charge under the facts, but rather a question of what charge the law allows. By creating a new form of second-degree manslaughter applicable to the aggravatedly wanton deaths of children left in cars,

the legislature has dictated the maximum appropriate charge. When those circumstances arise, and the death is the result of aggravatedly wanton conduct, the highest possible charge is second-degree manslaughter. In essence, the presence of those circumstances works as a mandatory mitigator, knocking the highest charge from wanton murder to second-degree manslaughter.

■ As in any case, which offenses to instruct on is a question of law: what is the highest offense the defendant may be convicted of? When the evidence establishes the aggravatedly wanton death of a child due to leaving a child under the age of eight in a vehicle, the answer is second-degree manslaughter. As a matter of law, these statutory factual qualifiers, when present, dictate what instructions the trial court may give to the jury, and exclude a murder instruction and a mere-wantonness second-degree manslaughter instruction.[3] Whether this was a wise choice by the legislature is not for this or any court to

judge.[4] Instead, we must apply the law as written to the facts of each case.

Under the undisputed facts of this case, wanton murder was not the appropriate charge, nor was it appropriate to instruct on wanton murder. Because there was no question that the child victim was under age eight and died from being left in a car, the trial court should never have instructed the jury on wanton murder. Both the murder instruction and the murder conviction were foreclosed as a matter of law. For that reason Shouse's conviction for that offense cannot stand. Although Shouse's wanton murder conviction must be vacated, she may still be retried for second-degree manslaughter.

**B. The evidence was insufficient to support a conviction for first-degree wanton endangerment.**

■ Shouse also argues that there was insufficient evidence to convict her of wanton endangerment for taking her child

---

**3.** Where there is a factual dispute over one of those statutory qualifiers, the trial court may instruct on the higher offense of murder, but must take into account that the jury may not believe the Commonwealth's theory of the case. Though it is an extreme example, imagine a situation where a child is found dead in a car, and the Commonwealth puts on proof that that child died from being left in a hot shed and was then moved to a car to cover the crime, and the defense puts on proof that the child died from being left in a car. This proof would create a dispute over how the child died, and would justify the giving of a murder instruction. But the instruction must be tailored to the proof. In such a situation, the murder instruction would have to require the jury to find that the child did not die from being left in a car (similar to how some murder instructions must require the jury to find that the defendant was not acting under extreme emotional disturbance). This could be accomplished by including the alternative means of death (being left in a shed) in the murder instruction, which would logically exclude death from being left in a car. If the

jury cannot find that fact, then its consideration must be directed to a second-degree manslaughter conviction as the highest level of offense.

**4.** Indeed, the statute, as written, could have perverse outcomes. For example, if a child over the age of eight died from being left in a car, and the parent who left the child there was aggravatedly wanton, that parent could be convicted of wanton murder—a higher offense—but only of the lower offense if the child was under age eight. No doubt, the General Assembly chose age eight because it presumed children that age or older would likely be able to get of the car or draw the attention of a passerby. But there are many scenarios, such as a disabled older child or a disabled adult, that the statute does not appear to have been designed to address. The effect of the statute, though no doubt unintended, is to treat the deaths of younger children as somehow having less moral repugnance than the deaths of older children under the same circumstances.

with her when she drove to Burch's house and obtained marijuana. The Commonwealth offered proof that she had taken drugs, that she was driving on a spare "donut" tire, and that she drove more than fifteen minutes. She moved for a directed verdict on this issue at the close of the Commonwealth's case and at the close of proof, but the trial court denied the motion. This was error.

To convict a defendant of first-degree wanton endangerment, the Commonwealth must prove conduct "manifesting extreme indifference to the value of human life" that creates a substantial danger of death or serious physical injury to another person. KRS 508.060(1). The state of mind required for this offense is "aggravated wantoness," the same mental state as for wanton murder, or under the facts of this case, second-degree manslaughter. And the danger to be created is not just any danger—it must be a substantial danger of death or serious physical injury. There is a clear distinction between driving, even under the influence of drugs and in a vehicle with a spare donut tire on the car, and leaving a child abandoned in a car overnight to die. And no harm came from her driving at that point, so it is difficult to say that there was a *substantial* danger of death or serious physical injury. Otherwise, driving with a donut tire replacing a flat to get home from a dinner where one had consumed a glass of wine would *per se* be first-degree wanton endangerment. Certainly a possibility of injury existed, but further proof of the degree of danger is necessary for the higher offense.

The Commonwealth cites *Ramsey v. Commonwealth*, 157 S.W.3d 194 (Ky.2005),

as support for the conviction. While a deeply divided Court held in that case that driving while intoxicated and with a child in the car can support a conviction for first-degree wanton endangerment, the facts in this case fall well short of those in *Ramsey*. In *Ramsey*, the defendant was heavily intoxicated, appearing drunk, smelling of alcohol, and having slurred speech. *Id.* at 196. The Court also noted that the defendant "was not simply driving under the influence as he tried to argue," *id.* at 198, because "his physical acts of driving included more than one reported lapse: it was his third time of operating a motor vehicle despite a license suspension for DUI; he was driving while intoxicated; he suddenly accelerated the vehicle at a speed noticeably higher than the normal; and he turned off the vehicle's headlights while still on the road," *id.*

Here, there is no evidence of how intoxicated Shouse was or whether she drove erratically or dangerously. Even when the evidence is viewed in the light most favorable to the Commonwealth, it does not rise to the level of that found, barely, to constitute first-degree wanton endangerment in *Ramsey*. Under the evidence in this case, the conviction for first-degree wanton endangerment must be reversed.

**C. Other claims of error.**

Shouse raises other claims of error that do not require reversal.

**1. Statutory double-jeopardy bar does not bar conviction for both homicide and second-degree criminal abuse.**

First, Shouse claims that her homicide conviction [5] and second-degree criminal

---

**5.** Shouse's argument focuses on wanton murder. Though we are vacating the conviction for wanton murder, this argument is not moot because Shouse may be retried for second-degree manslaughter under the circumstances of this case. Because the elements of second-

degree manslaughter, as applied under the limited circumstances of this case, are the same as for wanton murder, the argument works the same way and would apply to a possible second-degree manslaughter conviction.

abuse conviction create statutory double jeopardy under KRS 505.020(1)(a).[6] Ordinarily, a single course of conduct can establish multiple offenses. *See* KRS 505.020(1). There is an exception to this, however, when "[o]ne offense is included in the other." KRS 505.020(1)(a). In other words, a defendant cannot be convicted of an offense (e.g., murder) and a lesser included offense (e.g., first-degree manslaughter) for the same conduct. For purposes of this exception, "[a]n offense is so included when ... [i]t differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person ... suffices to establish its commission." KRS 505.020(2)(d). Shouse argues the second-degree criminal abuse differed from her homicide conviction only in that it presented a less-serious injury. This is simply incorrect.

■ The injury in a homicide is death. A less-serious injury might include a "serious physical injury," as used in the assault statutes. Thus, where a serious physical injury results in death, a person cannot be convicted of both assault and homicide; the assault merges into the homicide. *See* KRS 505.020 Ky. Crime Comm'n/LRC Cmt. (1974) ("The assault offense, differing from the homicide offense only as to the degree of injury to person, would be an 'included' offense.").

■ But one of the results forbidden by second-degree criminal abuse, as charged in this case,[7] was not a physical injury. Rather, it was that Shouse "[c]ause[d] torture, cruel confinement or cruel punishment." KRS 508.110(1)(c). This is a different element than causing death and is not included in death (i.e., it does not merge as causing serious physical injury would). Thus second-degree criminal abuse was *not* a lesser included offense of wanton murder, or of second-degree manslaughter, in this case. The offenses are separate offenses and conviction for both is legal. Consequently, there is no statutory double-jeopardy bar.

**2. Admission of evidence of prior instances of leaving the child unattended was error but was harmless.**

■ Shouse's next claim, that evidence of prior conduct was improperly admitted in violation of KRE 404(b), has some merit. The fact that on two prior occasions Shouse had briefly left her son unattended in the car cannot be fitted under any KRE 404(b) exception, standing alone.

Proof that Shouse had previously intentionally left her son in the car for short periods does not show that she wantonly did so on the night in question. Indeed, the proof indicates that she was not even aware that she had left the child in the car. To be proper KRE 404(b) evidence, her prior acts must show more than mere propensity to do an act, and must prove something else, such as motive, knowledge, absence of mistake, or identity.

The Commonwealth does not expressly argue any of these grounds, saying only that the acts "illuminate what was in her mind when she left her child in the car and killed him." But the prior acts cannot show Shouse's wanton mental state, specifically that she knew of the risk involved and consciously ignored that risk, because they differed too much from what hap-

6. Shouse mistakenly cites KRS 505.020(1)(b), which addresses inconsistent findings of fact, in the opening sentence of this argument, but her claim is clearly brought under KRS 505.020(*l*)(a), which is cited later in the opening paragraph.

7. Causing a serious physical injury, however, can serve as the basis of an abuse charge. *See* KRS 508.110(1)(a). If that had been the basis of the abuse conviction, then there would have been a double-jeopardy issue here.

pened here. If anything, that she had safely left her child in the car in the past—without injury, much less death—would tend to show that she was *unaware* of the risk of leaving the child in a car. The first incident occurred when a neighbor saw the child unattended in the car for ten to fifteen minutes before Shouse came down to the car. The neighbor confronted Shouse, who said that she was just coming back to get him, and that she would never leave him in the car. The second act involved briefly leaving the child in the car while Shouse dropped off some items at a friend's house. Obviously, neither of those instances compares to the facts related to her actions on the night the child died. Each of those involved a conscious decision to briefly leave the child in the car, and then coming back for him. Sadly, that is not what happened on the night in question.

One could argue that these intentional instances could show lack of mistake on Shouse's part the night her son died, but no one has suggested that she intentionally left him in the car to die. Indeed, this is why the highest charge in the instructions was *wanton* murder (though that was not a proper instruction, as explained above).

Nothing else about these two prior events shows a relevant, permissible fact under KRE 404(b). The evidence could only be used to show that Shouse had a propensity for leaving her son in the car—but propensity is exactly what is forbidden by KRE 404. Thus the evidence of the other instances was not properly admissible 404(b) evidence.

Even so, this evidence is clearly harmless in this case because there is no substantial likelihood that it affected the verdict. Shouse does not actually deny any of the facts in evidence, and in light of this Court's holding that she cannot be convict-

ed of wanton murder under these facts, she cannot establish prejudicial harm.

**3. Admission of evidence of prior instances of drug use, unemployment, and reliance on parental support was not reversible error.**

 . Shouse further complains that the trial court allowed improper KRE 404(b) evidence about her prior use of drugs, her unemployment, and reliance on her parents for financial support. First, it appears that Shouse objected to such evidence only one time, despite numerous references to it. To the extent that most of this proof was admitted without objection, it is subject only to palpable-error review.

 This Court concludes that the evidence does not require reversal. While not relevant, unemployment and dependance on parental support have only a tentative connection to Shouse's character, which is what KRE 404(b) is concerned with. *See* KRE 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the *character* of a person in order to show action in conformity therewith." (emphasis added)). Previous drug use, however, reflects poorly on character and directly implicates KRE 404(b). But given that the other evidence demonstrated her drug use on the night the child died, a fact far more relevant to determining her culpability, this proof had little effect in showing that she acted in conformity with her prior instances of drug use. Again, this evidence was not prejudicial and does not require reversal.

**4. Admission of phone records was not reversible error.**

 Shouse also claims the Commonwealth was allowed to introduce her telephone records without proper authentication. There is some confusion about preservation in regard to this claim.

Counsel for Shouse did initially object to the lack of a proper foundation for the records, but appears to have abandoned that objection at a bench conference, and instead focused on limiting the records admitted. And the record indicates that the evidence of her phone records that was admitted was at most cumulative of other properly admitted evidence. This evidence was not harmful error, and certainly cannot rise to the level of palpable error.

**5. The claimed error in Detective Downs' comment on Shouse's right to silence was not palpable error.**

Shouse also claims that Detective Downs impermissibly commented on her right to remain silent. At trial, Downs testified that Shouse at first agreed to give a blood or urine sample to be tested for drugs, but then changed her mind and declined to do so. This resulted in the police not being able to get toxicology results the day after the child was left in the car overnight and died. Counsel objected that this not only impacted Shouse's right to remain silent, but also that this evidence had not been listed in discovery, and moved for a mistrial. When the Commonwealth showed that it had been included in discovery, counsel then withdrew the motion for a mistrial and did not make any further objection or request additional relief. Thus this issue is not preserved for review. The alleged error does not rise to the level of palpable error.

**6. The trial court did not err in not granting a continuance.**

Shouse also claims the trial court erred in not granting her motion to continue the trial, which she made seven weeks prior to trial. The grounds for the motion generally concerned ordinary preparations for trial, and stated a concern that the defendant would not be ready. The trial court denied the motion. At a later pre-trial appearance, the motion was not renewed, and counsel represented the defendant at trial. There was no error.

**7. There was no cumulative error.**

And, as a final matter, Shouse argues that cumulative error was so great her convictions must be reversed. This type of boilerplate argument is not well taken, however. There was no reversible cumulative error.

### III. Conclusion

Based on the foregoing, Shouse's conviction for wanton murder is vacated, and her conviction for first-degree wanton endangerment is reversed. Her conviction for second-degree criminal abuse is affirmed. This case is remanded to the trial court for a new trial on the homicide charge, conviction for which is capped at second-degree manslaughter.

All sitting. All concur.