RENDERED: DECEMBER 15, 2016
TO BE PUBLISHED

𝔖upreme 𝔠ourt of 𝔎entucky FINAL

2014-SC-000379-MR

DATE 1/5/17 _Kim Redmon_, DC

JOSHUA HAMMOND

APPELLANT

ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.                   HONORABLE PHILLIP J. SHEPHERD, JUDGE
NO. 12-CR-00099-002

COMMONWEALTH OF KENTUCKY

APPELLEE

**OPINION OF THE COURT BY JUSTICE VENTERS**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

Appellant, Joshua T. Hammond, appeals from a judgment of the Franklin Circuit Court convicting him of first degree robbery; first degree assault; reckless homicide; and tampering with physical evidence. By agreement with the Commonwealth, Appellant reserved his right to appeal the finding of guilt and waived the sentencing phase of the trial in exchange for sentencing as follows: twenty years for first degree robbery and twenty years for first degree assault, to be served concurrently; and five years for reckless homicide and five years for tampering with physical evidence, to be served concurrently with each other but consecutively to the two twenty-year sentences, for a total sentence of twenty-five years.

As grounds for relief, Appellant makes the following claims: (1) he was denied a fair trial by the presence of spectators during the trial wearing t-shirts

sympathetic to the victim; (2) he was improperly convicted of first degree assault because (a) the assault merged into the robbery charge, or (b) the assault merged into the homicide charge, or (c) there was no proof that Appellant caused a serious physical injury to the victim; (3) the trial court erred by denying his motion to dismiss four jurors for cause; (4) the trial court erred by denying his request for a voluntary intoxication instruction; and (5) the trial court erred by denying his request for a duress instruction.

For the reasons explained below, we affirm Appellant's convictions for first degree robbery, reckless homicide, and tampering with physical evidence. We reverse Appellant's conviction for first degree assault.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In the light most favorable to the verdict, the facts established at trial are as follows. Appellant, Travis Wright, and James Simons traveled together in Appellant's pickup truck to Lexington where they bought twenty Percocet pills for recreational use. After making the purchase, the men drove to Georgetown where Appellant devised a plan to rob Charles Monroe, a drug dealer who lived in Frankfort. Wright declined to participate in the plan, and in his stead, David Bruce joined Appellant and Simons to carry out the robbery.

Appellant, who was described by Bruce and Simons as the leader of the group, called Monroe to set up a meeting. The trio set out for Frankfort in Appellant's pickup truck well-equipped for the planned robbery, having with them a telescoping police baton, brass knuckles, a knife, and a BB pistol. It

2

appears that during this time, Appellant consumed an unknown quantity of the pills.

Monroe met the trio outside his apartment building. Appellant and Monroe then went into the apartment for a brief time. When they returned, Monroe got into Appellant's truck and all four men drove to a nearby Walmart. Monroe and Appellant entered the store while Bruce and Simons waited in the truck. Appellant and Monroe returned to the truck, but instead of heading back toward Monroe's home, Appellant drove onto the I-64 entrance ramp. When Monroe protested that they were going the wrong way, Appellant stopped the truck on the side of the ramp and yelled at Monroe, "I'm tired of you fucking with us." Appellant demanded that Monroe hand over his money and drugs. While still seated in the truck, Appellant began hitting Monroe on the head with the police baton.

Monroe grabbed a knife that lay in the truck and attempted to defend himself with it. He lunged toward Bruce with the knife, but it was deflected and cut Simons in the leg. Appellant exited the truck and went around it to the passenger door. With either Bruce or Simons, or both of them then holding Monroe in a chokehold,[1] Appellant struck Monroe on the head with the baton and began removing his clothes in a search for drugs. After pulling Monroe

---

[1] Simons said that he held Monroe in a "guillotine hold." Bruce testified that Simons held Monroe in a "sleeper hold." Perhaps the former description is more precise since the hold was apparently fatal.

3

from the truck and removing two Percocet pills and $160.00 from his pockets, Appellant left him lying on the side of the road wearing only his underwear.

A by-passer witnessing the event called the police. As the perpetrators drove away, they threw Monroe's cell phone and clothing out of the truck. Later, at Simons' apartment they split up their meager take. Appellant cleaned out his truck to remove any remaining evidence of the event.

Monroe died as a result of the assault. The medical examiner, Dr. John Hunsaker, testified that the cause of Monroe's death was asphyxiation, most likely a result of the chokehold. Dr. Hunsaker could not rule out the possibility that the fatal throat injury could have been caused by the blow of a baton, but there was no evidence to indicate that such a blow had been struck. Following a jury trial, Appellant was convicted and sentenced as described above.[2] This appeal followed.

## II. THE TRIAL COURT DID NOT ERR BY DENYING APPELLANT'S MOTION FOR A MISTRIAL BECAUSE OF COURTROOM DISPLAY OF VICTIM SUPPORT

Appellant's first argument is that he was denied a fair trial because some individuals, presumably the victim's friends or family members, wore t-shirts at the trial displaying Monroe's picture along with the message, "We Will Never Forget." The issue arose on the first day of the guilt phase of the trial. Defense counsel approached the bench, objected to the jury's exposure to this display, and asked the trial court to take appropriate remedial steps. The trial court

---

[2] Simons pled guilty to, among other offenses, second degree manslaughter and received a sentence of twenty-five years.

noted that only one or two spectators were wearing the shirts, in contrast with an earlier pretrial hearing at which several attendees were attired in the shirts. The court also noted the individuals' First Amendment right to free speech attached to their t-shirt messages and that the court could only restrict that right if the display interfered with, or detracted from, the trial proceedings to the extent of rendering it prejudicial. The judge agreed to monitor the situation to prevent prejudice.

Two days later, a much larger contingent of Monroe sympathizers wore demonstrative t-shirts to the trial. Appellant raised the issue again by moving for a mistrial, complaining that the display of victim support by the Monroe family amounted to an effort to intimidate the jury. The Commonwealth responded that those in attendance had a First Amendment right to express themselves in that fashion.

The trial court found that the Commonwealth had not promoted or encouraged the display of victim support and, ultimately, denied Appellant's motion for a mistrial. The court found that wearing the shirts was an activity protected by the right of free speech which did not prejudice Appellant's right to a fair trial. The court concluded, "I don't think it's intimidating to the jury at all. . . . I don't think it's created an intimidating environment for the jury." The court did, however, ask the Commonwealth to caution the Monroe family about the t-shirts. Appellant raised the issue a final time after the close of the Commonwealth's case, renewing his motion for a mistrial by noting that the

5

local newspaper had published a photograph of the t-shirt on its front page. The trial court declined to grant a mistrial.

In *Carey v. Musladin*, 549 U.S. 70, 72 (2006), the United States Supreme Court acknowledged that it had addressed the issue of prejudicial courtroom attire *only* in the context of state-sponsored practices. The Supreme Court left the issue of "private-actor courtroom conduct" and its deleterious effect upon a defendant's fair-trial rights as "an open question in our jurisprudence." *Id.* at 76.

*Carey* was a federal habeas corpus action arising out of a state murder trial where several individuals in the courtroom audience wore buttons memorializing the murder victim. The state court found no violation of the defendant's right to a fair trial in these expressions of victim support. As a habeas corpus case, the central question in *Carey* was whether the state court's ruling constituted "an unreasonable application of clearly established Federal law as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). Since the Supreme Court had never provided a rule for determining the point at which the wearing of victim-support messages by private individuals would be considered inherently prejudicial, the *Carey* court reasoned that habeas relief was not available. 549 U.S. at 77.

In *Allen v. Commonwealth*, 286 S.W.3d 221 (Ky. 2009), we announced the following approach to the wearing of victim support messages:

> As Justice Souter has wisely noted, 'one could not seriously deny that allowing spectators at a criminal trial to wear visible buttons with the victim's photo can raise a risk of improper considerations.'

6

> Because such displays are 'no part of the evidence going to guilt or innocence, and . . . are . . . an appeal for sympathy for the victim . . . and a call for some response from those who see them[,]' we agree with the Supreme Court of Kansas that the wearing of such buttons or clothing by spectators 'is not a good idea. . . .' We decline, however, to conclude that the wearing of such clothing or buttons in the courtroom is so inherently unfair as always to constitute reversible error. Such a holding would cause a structural error to have occurred each time a potential juror caught a fleeting glimpse of a t-shirt or button bearing the likeness of a victim. Instead, we conclude that the best course in these situations is for the trial court to determine if the spectators' display caused the defendant to suffer any tangible prejudice.

*Id.* at 229 (citing *Carey*, 549 U.S. at 82–83 (Souter, J., concurring); *State v. Speed*, 961 P.2d 13, 30 (Kan. 1998); *Billings v. Polk*, 441 F.3d 238, 247 (4th Cir. 2006)).

*Coulthard v. Commonwealth*, 230 S.W.3d 572, 576 (Ky. 2007), addressed a similar situation. The defendant in a homicide case claimed that his right to a fair trial was compromised by family members of the victim displaying the victim's image on t-shirts worn in the courtroom prior to trial and on license plates of cars in the nearby parking lot. The defendant asked the trial court to ban the "propaganda" from the courtroom and to order the Commonwealth to talk with the victim's family members regarding appropriate courtroom attire.[3] The trial court declined to do so, but nevertheless directed the prosecutor to ensure that the victim's family members dressed appropriately for the trial.

---

[3] In *Coulthard* the defendant characterized the messages of support as "propaganda," and Appellant follows that practice in this case. We do not adopt that characterization of the practice.

7

The trial judge in *Coulthard* took a wait-and-see approach, refusing to take more aggressive action but leaving the issue "open" and "subject to change" if inappropriate conduct occurred. On appeal, we rejected the defendant's argument, noting that it "could possibly have merit" if he had been able to establish that the "propaganda" was displayed in the courtroom during the trial or was seen by the jury. Because the defendant could not do so, we rejected his claim.

If it was not made clear in *Allen* and *Coulthard*, we take this opportunity to state that we generally disapprove of courtroom attire displaying images or messages of support for or against any party or issue in litigation. But, we recognize that remedial measures to restrict the practice are appropriate only when the display is capable of distracting the jury's attention from the trial proceedings, or it communicates to the jury an appeal for support or sympathy for one side of the case, which is often the intended purpose of the display. The trial court must eliminate any courtroom attire or display that is "so inherently prejudicial that [it would] deprive the defendant of a fair trial." *Carey*, 549 U.S. at 72.

Unlike *Coulthard*, here some victim support t-shirts were worn in the courtroom during the trial. However, Appellant is unable to show that any jurors were exposed to the message or were even aware of their presence. The trial court specifically found that the t-shirts did not create "an intimidating environment for the jury," and the Monroe family was admonished to be mindful of the t-shirts. Appellant did not ask to examine the jury on the issue

8

to establish a more complete record for our review. Since we cannot conclude with any assurance of accuracy that any jurors actually saw the messages, we cannot say that Appellant suffered actual prejudice from the limited display tolerated by the trial judge. The record is otherwise silent on the extent to which victim support messages were displayed in the courtroom and the extent to which jurors were exposed to, or affected by, them. We will not presume prejudice from a silent record. *Hart v. Commonwealth*, 116 S.W.3d 481, 483 (Ky. 2003).

"The decision to declare a mistrial is properly within the sound discretion of the trial court. A mistrial is an extreme remedy and should be resorted to only when there appears in the record a manifest necessity for such an action or an urgent or real necessity. A manifest necessity can be understood as to be an urgent need for a new trial in consideration of the totality of the circumstances. As such, a ruling declaring a mistrial will not be disturbed absent an abuse of discretion by the trial court." *Gray v. Commonwealth*, 480 S.W.3d 253, 273 (Ky. 2016) (citations and internal quotations omitted). Here, the trial court did not abuse its discretion by denying Appellant's motion for a mistrial.

### III. APPELLANT'S FIRST DEGREE ASSAULT CONVICTION MUST BE REVERSED

Appellant challenges his conviction for first degree assault on three different grounds: first, he contends that the assault charge merged into the robbery charge; second, he contends the assault charge merged into the

9

homicide charge; and third, he contends he should have received a directed verdict on the assault charge due to insufficient evidence that he inflicted a serious physical injury on Monroe. As explained below, we agree with Appellant that under particular facts of this case, as borne out by the evidence presented at trial, his first degree assault charge merged into his reckless homicide charge, and therefore, the first degree assault conviction must be reversed. Consequently, we need not address the other grounds offered by Appellant for reversal of his first degree assault conviction.

Appellant contends that the first degree assault conviction must be set aside because it was subsumed by the murder charge, and ultimately, merged with the reckless homicide conviction. As instructed by the trial court and consistent with the assault definition in KRS 508.010, to convict Appellant of first degree assault, the jury had to believe from the evidence one of these two alternatives: 1) that Appellant intentionally struck the blows, or intentionally acted in complicity with Simons and Bruce who struck the blows, that inflicted serious physical injury upon Monroe by means of a deadly weapon or dangerous instrument; or 2) that Appellant wantonly engaged in conduct that created a grave risk of Monroe's death thereby resulting in a serious physical injury to him.

Central to Appellant's argument is his contention that the evidence presented at trial established that the mortal throat injury was the only "serious physical injury" inflicted upon Monroe. *Shouse v. Commonwealth,* 481 S.W.3d 480 (Ky. 2015), firmly establishes that a single injury which proves to

10

be fatal cannot simultaneously serve as the injury underlying an assault conviction *and* the fatal wound resulting in the death underlying the homicide conviction. "[W]here a serious physical injury results in death, a person cannot be convicted of both assault and homicide; the assault merges into the homicide." *Id.* at 490.

The Commonwealth responds with the assertion that the mortal throat wound was *not* the only serious physical injury inflicted upon Monroe. The Commonwealth contends that the head wound inflicted by Appellant using a police baton was a separate and distinct "serious physical injury" sufficient in its own right to support the first degree assault charge.[4] Thus, the question of whether the assault conviction is merged into the reckless homicide conviction first turns on whether, based upon the evidence presented at trial, the non-fatal head wound could have been reasonably found to be "serious physical injury" to support the assault conviction. We conclude that the evidence was not sufficient to establish that the non-fatal wound was "serious physical injury," and thus we agree with Appellant that his assault conviction must be vacated.

"In a criminal case, the Constitution of the United States requires the government to prove each element of the charged offense beyond a reasonable

---

[4] Because neither the jury instructions nor the associated verdict forms required the jury to specify which injury it found as the factual predicate of the assault conviction, it is impossible to exclude the possibility that it based the assault and homicide convictions on the same injury. The instructions thus left open the distinct possibility that the assault conviction would have to be vacated as a violation of the unanimous verdict rule set forth in *Johnson v. Commonwealth* 405 S.W.3d 439 (Ky. 2013). Our disposition renders that possibility moot.

11

doubt." *McDaniel v. Commonwealth*, 415 S.W.3d 643, 658 (Ky. 2013) (citations omitted). Because of the merger principle explained in *Shouse*, the head wound stands as the only injury that could support Appellant's assault conviction, and was, therefore, an element of the first degree charge which the Commonwealth had to prove beyond a reasonable doubt. KRS 500.080(15) defines "serious physical injury" as "physical injury which creates a substantial risk of death, or which causes serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of any bodily organ."

While it is not the function of this Court to re-weigh the evidence to determine whether the head injury inflicted upon Monroe by Appellant's use of the baton was a "serious physical injury," the weight of the evidence suggests rather convincingly that it was not. It is our function to decide whether the evidence was legally sufficient to support that factual determination. The only medical witness, Dr. Hunsaker, explained that the blows inflicted upon Monroe's head by Appellant's baton produced only superficial wounds which did not cause a substantial risk of death and, had Monroe survived the throat injury, would not have caused serious and prolonged disfigurement, prolonged impairment of Monroe's health, or prolonged loss or impairment of the function of any bodily organ so as to meet the statutory definition of "serious physical injury" under KRS 500.080(15).

To the contrary, the Commonwealth relies solely upon Simons' testimony that Appellant struck Monroe's head repeatedly with the baton and that

12

Monroe's head was bleeding. Of course, not every bloody wound is a "serious physical injury" under the definition set out in KRS 500.080(15). No matter how brutal the attack or how gruesome the wound appeared to Simons, the appearance of the wound is insignificant.[5] Rather than its awful *appearance*, it is the awful *effect* of the wound in creating a substantial risk of death, serious and prolonged disfigurement, prolonged impairment of health, or prolonged loss or impairment of the function of a bodily organ that determines its legal status. Nothing submitted in the evidence provides any reasonable basis for concluding that the head injury met the criteria required by KRS 500.080(15). We are therefore constrained to conclude that the evidence does not establish that the head wound was a "serious physical injury" that could properly have formed the basis of the first degree assault conviction.

Consequently, one of two things occurred which compels us to reverse Appellant's first degree assault conviction: either the trial court erred by submitting to the jury a first degree assault charge based upon evidence insufficient to establish that the head wound was a "serious physical injury;" or, the jury was improperly permitted to find Appellant guilty of both first degree assault *and* reckless homicide based upon the serious injury to Monroe's throat.[6] Either way, we must vacate the first degree assault

---

[5] Simons, as one who inflicted the mortal throat wound, could be regarded as naturally having an incentive to emphasize or exaggerate the apparent severity of the head wound so as to divert responsibility from himself.

[6] We also note that pursuant to the definition of first degree assault provided in KRS 508.010, the jury was instructed that to find Appellant guilty of first degree assault as either the principal or an accomplice, it had to believe that the serious physical injury was inflicted upon Monroe "by means of a deadly weapon or dangerous instrument."

conviction. Because the twenty year assault conviction was adjudged to run concurrently with the first degree robbery conviction, the reversal of the assault conviction affects neither Appellant's total sentence nor his parole eligibility.

## IV. THE TRIAL COURT DID NOT ERR BY REFUSING APPELLANT'S MOTION TO EXCUSE JURORS FOR CAUSE

Appellant next contends that the trial court violated his due process right to a fair trial by failing to excuse for cause jurors T.W., G.I., J.S., and P.J. Whether to exclude a juror for cause lies within the sound discretion of the trial court, and on appellate review, we will not reverse the trial court's determination "unless the action of the trial court is an abuse of discretion or is clearly erroneous." *Ordway v. Commonwealth*, 391 S.W.3d 762, 780 (Ky. 2013) (citations omitted).

RCr 9.36(1) provides that the trial judge shall excuse a juror for cause when "there is reasonable ground to believe that the prospective juror cannot render a fair and impartial verdict." The trial court's decision to exclude a juror for cause must be based on the totality of the circumstances rather than a response to any single question. *Fugett v. Commonwealth*, 250 S.W.3d 604, 613 (Ky. 2008). "The trial court has the duty to evaluate the answers of prospective jurors in context and in light of the juror's knowledge of the facts

---

The only evidentiary reference to a deadly weapon or dangerous instrument was the baton Appellant used to strike Monroe's head. The Commonwealth speculated that the baton might have come in contact with Monroe's throat but no evidence suggested that possibility. Unless Simons' or Bruce's arms, used as a chokehold, could be qualified as "dangerous instruments" under KRS 508.010(13), no evidence established that the throat wound was inflicted by means of either a deadly weapon or a dangerous instrument, thus further undermining the foundation of the first degree assault conviction.

14

and understanding of the law." *Stopher v. Commonwealth*, 57 S.W.3d 787, 797 (Ky. 2001).

Given the "reasonable grounds" standard set by RCr 9.36(1), we emphasized in *Ordway* that "when there is uncertainty about whether a prospective juror should be stricken for cause, the prospective juror should be stricken. The trial court should err on the side of caution by striking the doubtful juror . . . ." 391 S.W.3d at 780. With the above standards in mind, we consider whether the trial court abused its discretion by failing to strike for cause the four jurors identified by Appellant.

**A. Juror T.W.**

During the voir dire Juror T.W. approached the bench and informed the court of two concerns. T.W. disclosed that her husband had worked briefly for the Franklin County Sheriff's Office with the lead detective in the case. In response to questioning on that subject, T.W. said she could be objective.

T.W. also disclosed that she had gone to school with the victim's sister. T.W. explained that she did not have a personal relationship with the sister, but nevertheless, had sympathy for her for what the victim's family had gone through. When the Commonwealth asked T.W. if she could put aside her sympathy for the victim's family and decide the case solely on the evidence, she said, "I guess my sympathy could impact, I guess it could." Defense counsel then followed up on the Commonwealth's questions about T.W.'s sympathies. She then responded that she would be objective and that she would not be influenced by her feeling of sympathy for the victim's family. The trial judge

15

then asked T.W. again if she could set aside her personal sympathy and decide the case solely on the evidence; she said she could.

Appellant moved to strike T.W. for cause, pointing out that the court had excused another juror who had "extrajudicial information" about the Monroe family, and that similarly, T.W. had "extrajudicial sympathy" for the family. The trial court construed T.W.'s expression of sympathy for the family as the "generic normal emotion that everybody has to some extent," rather than sympathy generated from a specific connection to a party or an interest in the case. The judge denied the motion to strike.

The fact that T.W.'s husband had worked with the lead detective at one time is not a basis for her removal from the venire. A friendly relationship with a police officer is, alone, not a sufficient basis for disqualification of a juror. *Maxie v. Commonwealth*, 82 S.W.3d 860 (Ky. 2002) (Acquaintance of the arresting police officer because their children were friends did not disqualify juror whose assurance satisfied the judge that she could fairly weigh the evidence and find the defendant not guilty if the evidence was not sufficient to convict.). Being a police officer is also not a disqualification. *Bowling v. Commonwealth*, 942 S.W.2d 293 (Ky. 1997).[7] Appellant's concern of T.W.'s bias based upon her husband's relationship with the lead officer is not persuasive.

---

[7] Overruled on other grounds by *McQueen v. Commonwealth*, 339 S.W.3d 441 (Ky. 2011).

T.W.'s expression of sympathy for the Monroe family is somewhat more problematic. She first said with apparent uncertainty that her sympathy for the murder victim's family "*could*" affect her thinking rather than that it "*would*." In evaluating her statements, the trial court determined that T.W.'s sympathy was of a general sort that would be felt by any "normal" person pondering the circumstances of a homicide. While we realize that there is no such thing as a magic question to rehabilitate the juror who has already expressed a tangible bias, T.W.'s acknowledgment of sympathy was, at most, ambivalent before she said she would decide the case solely on the evidence, without the influence of sympathy. Based upon the totality of the circumstances, we are unpersuaded that the trial court abused its discretion when it denied Appellant's motion to strike T.W.

## B. Juror G.I.

Juror G.I. was a former military police officer and firearms instructor who also had been a Nicholasville[8] police officer for five years. He was also a friend of one of the Commonwealth's chain of custody witnesses. Asked during voir dire if he would tend to place more weight on his friend's testimony, G.I. responded that he knew the witness as a credible person; that "police officers make mistakes;" that he would not "give favoritism toward someone for being a police officer;" that police officers involved in chain of custody procedures

---

[8] Nicholasville is in Jessamine County; Appellant's crimes occurred several miles away in non-adjoining Franklin County.

"would either do it correctly or incorrectly;" and that he was familiar with the Kentucky Revised Statutes.

Appellant challenged G.I. for cause on the basis of his personal relationship with a police witness and upon his significant knowledge of Kentucky law. The Commonwealth responded that it would agree with Appellant if a substantive witness was involved, but here the witness was merely a chain of custody witness.

As noted above in our analysis of the challenge to Juror T.W., the mere fact that G.I. was a former police officer and a current friend of a police officer does not automatically disqualify him from jury service. *Maxie*, 82 S.W.3d 860; *Bowling*, 942 S.W.2d 293. G.I.'s belief that his friend, the chain-of-custody witness, was credible is not disqualifying especially as Appellant did not challenge the credibility of the witness or the subject of his testimony. Nor do we believe that G.I.'s familiarity with Kentucky law and police procedures casts doubt upon his qualification for jury service. *Maxie*, 82 S.W.3d 860. We see no abuse of discretion in the trial court's failure to remove Juror G.I. for cause.

**C. Juror J.S.**

Drugs, drug addiction, and drug transactions were central themes in this case. The perpetrators and victim alike were either allegedly or admittedly involved in the culture of the drug trade. Accordingly, during voir dire, Appellant's counsel inquired into the issue of drugs and drug addiction.

Juror J.S. expressed the opinion that drug addiction was not an excuse for committing a crime; the blame rested squarely upon the offender. J.S. had

18

two friends who became addicted to drugs and resorted to crime, but he believed that their addiction did not excuse their conduct. J.S. also said that his mother was addicted to pills, and ultimately, committed suicide because she could not live without them. J.S. disclosed, too, that he had known the victim growing up. Nevertheless, under further questioning, Juror J.S. stated that he thought he could be fair.

Appellant's counsel moved to strike Juror J.S. for cause, stressing that his personal experiences with addicted friends and family disqualified him from serving in a case saturated with witnesses testifying about drug addiction. The trial judge denied the motion but noted J.S.'s mother's drug-related suicide made it a "close call."

We find nothing in J.S.'s responses to disqualify him from jury service. Tragedies undoubtedly affect the lives of prospective jurors but not necessarily their judgment and impartiality. J.S. was unequivocal in his confidence that his partiality had not been compromised by his life's events, and we cannot say that his experiences were so unusual or traumatic that they create a presumption of bias. *See Little v. Commonwealth*, 422 S.W.3d 238 (Ky. 2013) (Prospective juror in first degree assault/drunk driving case was not automatically disqualified because her husband, mother, and sister had been killed in two unrelated instances caused by drunk drivers.). We are satisfied that the trial court did not err in denying Appellant's motion to strike this juror for cause.

## D. Juror P.J.

During voir dire, Juror P.J. disclosed that her son was a correctional officer at the Franklin County Jail, the same facility where Appellant had been incarcerated for the two years preceding the trial. Although P.J.'s son was living with her at the time of the trial, she denied ever discussing the case with him. The trial court denied Appellant's motion to strike P.J. for cause. P.J.'s mother-son relationship with a correctional officer, at the facility in which the defendant was housed, does not create the kind of relationship from which an inherent disqualification from jury service would arise. The juror stated under oath that the she received from her son no information about Appellant or his case; we cannot otherwise presume a bias.

In summary, the trial court acted within its discretion when it denied Appellant's motions to strike Jurors T.W., G.I., J.S., and P.J. We see no error.

## V. APPELLANT WAS NOT ENTITLED TO AN INSTRUCTION ON THE DEFENSE OF INTOXICATION

Appellant contends that he was entitled to an intoxication instruction to inform the jury that his intoxication at the time of the attack on Monroe would be a defense if it believed he was intoxicated to the degree that it negated his ability to form the intent to commit the robbery and the assault. He cites testimony in evidence that he was addicted to drugs; that on the day of the crimes he had snorted Percocet; that he had taken valium that day; that he was "messed up" and "high" that day; that he was intoxicated after the crimes; that he was "toasted," "lit up," and "high" before, during, and after the crimes,

20

and on into the next day; that he was "out of it" that day; that after the crimes he was slurring his words and had to be helped, or practically carried up a flight of stairs to Simons' apartment; that he was too intoxicated to drive; and that he was swerving all over the road while driving that day.

"[A] trial court is required to instruct the jury on affirmative defenses and lesser-included offenses if the evidence would permit a juror reasonably to conclude that the defense exists or that the defendant was not guilty of the charged offense but was guilty of the lesser one." *Harris v. Commonwealth*, 313 S.W.3d 40, 50 (Ky. 2010) (citations omitted). We review a trial court's decision declining to give a requested instruction under the abuse of discretion standard. *Sargent v. Shaffer*, 467 S.W.3d 198, 203 (Ky. 2015).

KRS 501.080 provides as follows:

Intoxication is a defense to a criminal charge only if such condition either:

(1) Negatives the existence of an element of the offense; or

(2) Is not voluntarily produced and deprives the defendant of substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

We have interpreted KRS 501.080(1) to mean that an instruction on the voluntary intoxication defense is justified "only where there is evidence reasonably sufficient to prove that the defendant was so drunk that he did not know what he was doing." *Harris*, 313 S.W.3d. at 50 (citations omitted); *McGuire v. Commonwealth*, 885 S.W.2d 931 (Ky. 1994). "Intoxication, whether voluntary or involuntary, is a defense to an intentional crime if the effect of the

21

criminal conduct *except* in the limited situations in which the accused is left without the capacity to form the culpable mental state essential to the commission of the crime charged. Appellant's conduct clearly manifested the ability to form the intent required to govern his behavior and act in accordance with his intentions. The trial court was in the better position to evaluate the evidence and in this instance, we are satisfied that its rejection of Appellant's requested instruction was not an abuse of discretion.

In connection with this argument Appellant also argues that the trial court erred by not allowing him to present expert testimony concerning his drug use and state of intoxication at the time of the crimes. Appellant does not explain what his expert would have said that might overcome the impression created by his otherwise apparently conscious and reasoned behavior. He says only that the testimony "would have been of assistance to the jury." We are not convinced. The trial court's decision to admit or exclude evidence should only be reversed if it abused its discretion. *Berryman v. Commonwealth*, 237 S.W.3d 175, 179 (Ky. 2007). Absent a more compelling explanation of how the expert's opinion might have had some impact, we conclude that the trial court did not abuse its discretion in rejecting Appellant's attempt to present an intoxication expert.

### VI. APPELLANT WAS NOT ENTITLED TO AN INSTRUCTION ON THE DEFENSE OF DURESS

As his final argument, Appellant contends that he was entitled to a duress instruction, based upon the theory that Simons and Bruce had

intimidated him into committing the crimes against Monroe. Appellant cites the testimony of Detective Shane Weber indicating that Appellant told police investigators that Simons and Bruce had planned the robbery and that they had threatened to kill him if he told anyone. Weber testified that Appellant claimed that Simons and Bruce had a knife and every time "I started to say stop, they stuck a knife blade to my side and told me to shut up or they was going to cut me." Appellant claims that he was compelled by Simons and Bruce at knifepoint to commit the crimes against Monroe.

KRS 501.090 provides as follows:

(1) In any prosecution for an offense other than an intentional homicide, it is a defense that the defendant engaged in the proscribed conduct because he was coerced to do so by the use of, or a threat of the use of, unlawful physical force against him or another person which a person in his situation could not reasonably be expected to resist.

(2) The defense provided by subsection (1) is unavailable if the defendant intentionally or wantonly placed himself in a situation in which it was probable that he would be subjected to coercion.

As applied in this case, the critical element of KRS 501.090 is whether Appellant's situation was such that a person "could not reasonably be expected to resist" the alleged coercion from Simons and Bruce. The evidence at trial demonstrated that on at least two occasions — when Appellant went into Monroe's apartment and when he went into the Walmart store with Monroe — Appellant was ideally situated to "resist" the coercion allegedly being imposed upon him by Simons and Bruce by simply not returning to the vehicle, or by

24

notifying the police, or by telling Monroe about the planned robbery and the threats of violence toward Appellant if he did not participate in the crime. We are comfortable in concluding that, contrary to Appellant's claim, it is abundantly reasonable to expect a person in the situation Appellant claimed to resist Simons' and Bruce's coercive tactics when he had two easy opportunities to extract himself from the situation and save Monroe's life. Under the circumstances as Appellant presents them, he was manifestly not entitled to a duress instruction.

## VII. CONCLUSION

For the foregoing reasons, the judgment of the Franklin Circuit Court is affirmed in part and reversed in part, and this case is remanded for entry of a new judgment consistent with this opinion.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Shannon Renee Dupree
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Andy Beshear
Attorney General of Kentucky

Kenneth Wayne Riggs
Assistant Attorney General

25