RENDERED: FEBRUARY 16, 2023
TO BE PUBLISHED

# Supreme Court of Kentucky

2022-SC-0015-MR

ROGER D. BURDETTE                                          APPELLANT

|  | ON APPEAL FROM JEFFERSON CIRCUIT COURT |
|---|---|
| V. | HONORABLE A.C. CHAUVIN, JUDGE |
|  | NO. 19-CR-0516 |

COMMONWEALTH OF KENTUCKY                         APPELLEE

**OPINION OF THE COURT BY CHIEF JUSTICE VANMETER**

**<u>AFFIRMING</u>**

Roger Burdette appeals as a matter of right[1] from the Jefferson Circuit Court judgment sentencing him to twenty-seven years' imprisonment for his convictions of murder, four counts of wanton endangerment in the first degree, operating a motor vehicle while under the influence, and failure to give right-of-way to a stopped emergency vehicle. Burdette raises numerous issues in support of his request for a new trial, none of which mandate reversal of his convictions and sentence. Accordingly, we affirm.

---

[1] KY. CONST. § 110(2)(b).

## I. Factual and Procedural Background

The sad facts of this case involve a fatal vehicular collision on the afternoon of Christmas Eve in 2018, which resulted in the death of Louisville Metro Police Detective Deidre Mengedoht. Det. Mengedoht had pulled over a pickup truck on I-64 for speeding, just under the Belvedere, and activated the flashing lights on her vehicle. The Belvedere is an elevated event space located on the Riverfront between 4th and 6th streets in downtown Louisville. The portion of I-64 under the Belvedere is a sort of tunnel, darkened by the overpass above. Due to the lack of a shoulder on that stretch of I-64, Det. Mengedoht's vehicle and the pickup truck were stopped in the right lane of the interstate.

Det. Mengedoht approached the pickup truck and obtained the license of the driver, Quintin Brady, who had three passengers in his vehicle: his daughter, his girlfriend (Jasmine Parks) and Parks's sister. Brady described the location of his pickup truck as being under the Belvedere from the front of his truck to the front windshield, but the rest of his truck was exposed. Det. Mengedoht returned to her vehicle, which was entirely exposed and not under the Belvedere tunnel, and about five minutes later, a 30,000-pound tanker truck driven by Burdette crashed into her vehicle. The force of the collision pushed her vehicle against a concrete wall, past Brady's pickup truck, causing her vehicle to ignite in flames. The occupants of Brady's truck were able to escape with no major injuries, but no one could get close enough to rescue Det. Mengedoht, as the area all around her vehicle was engulfed in flames. Det.

2

Mengedoht died of smoke inhalation, thermal injuries, and blunt force injuries sustained in the collision.

At the time of the collision, Burdette was working as a commercial driver for Metropolitan Sewer District ("MSD"). He had been working all day and had just dropped off his last load of sludge at a treatment plant. When speaking to law enforcement officers at the scene, Burdette stated, "I was in the center lane – [inaudible] the slow lane, I'm sorry. And I start to switch over, and, last thing I know – I, I'm not even sure I hit the car first, but I think I did. But I was lookin' to get in the other lane. And when I looked up, too late." He further stated that "he saw [Det. Mengedoht] from pretty far back but didn't think she was that close."

When asked if he had anything to drink or had taken any medication, Burdette said that he took high blood pressure medicine and cholesterol medicine. Sergeant Michael Johnson observed that Burdette's eyes were bloodshot, his pupils appeared constricted, and he was very calm and nonchalant for someone who had just been in such a wreck. Sgt. Johnson testified that Burdette seemed a little slow and sluggish when responding, like he was not processing the information as fast as a regular person. To determine whether Burdette could safely operate a motor vehicle, Sgt. Johnson performed several field-sobriety tests. Based on Burdette's poor performance on these assessments, and Sgt. Johnson's observations of his demeanor, Sgt. Johnson suspected that Burdette might have taken some sort of narcotic analgesic and determined Burdette was "under the influence" while operating

3

the truck.  Several other witnesses at the scene testified that Burdette seemed to be unusually relaxed or emotionless, given that he had just been involved in a fatal collision.  At trial, the defense presented proof that Burdette suffered from hearing difficulties and often reacted slowly as a result.

Based on the circumstances surrounding the collision, law enforcement obtained a warrant to draw Burdette's blood. Burdette was placed under arrest and charged with murder, four counts of wanton endangerment in the first degree, operating a motor vehicle while under the influence, and failure to yield right-of-way to a stopped emergency vehicle.  He was transported to Louisville Metro Department of Corrections ("LMDC") for a blood draw.  David McCarthy, a registered nurse working at LMDC, drew Burdette's blood pursuant to the search warrant and also conducted a routine intake assessment of Burdette in conjunction with him being booked into jail.  The intake assessment form included a full medical and mental-health assessment and is performed on every inmate booked at LMDC.  One of the questions on the intake assessment form is whether the inmate has ingested any drugs or medication.  Burdette admitted to having consumed hydrocodone that day and that he takes it sometimes, without a prescription.

The testing performed on Burdette's blood indicated that Burdette had ingested two drugs – hydrocodone and clonazepam[2] – both of which are

---

[2] Clonazepam is the generic medicine for the brand name klonopin. Clonazepam is a benzodiazepine that is used to treat certain seizure disorders and panic disorder.  *Howard v. Commonwealth*, 595 S.W.3d 462, 466 n.2 (Ky. 2020) (citation omitted).

4

controlled substances. Burdette did not have a prescription for either.[3]

Medical testimony presented at trial explained that both hydrocodone and clonazepam affect the central nervous system, which could adversely affect a person's fine motor skills and reaction time, make one appear extremely relaxed, and cause constricted pupils. Text messages retrieved from Burdette's cell phone were presented to the jury showing that he had sporadically contacted someone who is not a doctor to purchase prescription drugs during the two-year period preceding the collision. The exact type of pill he had been purchasing was unclear from the texts. The defense presented the testimony of three witnesses who interacted with Burdette on the day of the collision and who testified to the effect that he did not appear to be intoxicated.

An analysis of the reconstruction of the scene, based in part on the equipment download generated from Burdette's tanker truck, revealed that coming into the collision Burdette maintained a fairly constant speed of 55 m.p.h. Officer Kisling testified that he did not see lengthy periods on the brake prior to the collision, and an inspection of Burdette's tanker truck revealed the brakes were in working order. In Burdette's defense, James Sobek, an accident reconstructionist, testified that very little light seeped into the tunnel where Det. Mengedoht's vehicle was parked and that the lighting would have adversely impacted visibility. Sobek further explained that the curvature of the road could have made it more difficult to assess lane placement and distance

---

[3] Burdette also had Zoloft, an antidepressant, in his blood, for which he had a prescription.

5

ahead, and that Det. Mengdoht's vehicle was parked in an unexpected location for a stop. Sobek acknowledged that – per the video of the collision - Det. Mengdoht's flashing lights on her vehicle were activated at the time. Still, Sobek believed that Burdette need not have been doing anything wrong for the collision to have occurred. During trial, the jury was permitted to leave the courtroom and view the vehicles involved in the collision, which had been transported to a street adjacent to the courthouse.

A forensic examination of Burdette's cell phone revealed that at the approximate time his tanker truck collided with Det. Mengedoht's vehicle (2:15 p.m.), his cell phone was streaming a pornographic video of two individuals engaged in oral and vaginal sex. By extracting data from Burdette's phone, Detective Aaron Gabhart, a member of the Secret Service Cyber Fraud Task Force, was able to discover the actions that the phone's user – ostensibly, Burdette – had performed immediately prior to and during the collision. The jury heard evidence that approximately four minutes prior to the collision, Burdette had unlocked his phone, activated an internet browser, and began streaming a pornographic video from the website "xvideos.com." The phone received the first file at 2:12 p.m. and the last file at 2:16 p.m.; the final entry in the phone's log was 2:20 p.m., when Burdette manually closed the internet browser app. Det. Gabhart testified that the video from "xvideos.com" was in the foreground of the phone's screen during this period and contained sexual activity with very little audible dialogue. Det. Gabhart further testified the

6

Burdette had visited "xvideos.com" several other times on the day of the collision: at 8:53 a.m., 10:02 a.m., 12:33 p.m., 1:08 p.m., and 1:36 p.m.

The Commonwealth argued to the jury that Burdette acted wantonly with extreme indifference to the value of human life because he was impaired and watching a pornographic video when he collided with Det. Mengedoht's vehicle. During closing argument, defense counsel argued that the Commonwealth failed to meet its burden of proving wantonness, and, if anything, Burdette acted recklessly. Defense counsel stated: "Here's why: You heard from Mr. Sobek that clearly he missed something but you also heard from Roger." Defense counsel then played the body camera recording introduced by the Commonwealth through Sergeant Elisha Thompson, in which Burdette is heard saying, "Last thing I know, I'm not even sure I hit the car first, but I think I did."

The trial court called the parties to the bench and ruled **sua sponte** that defense counsel could not use Burdette's statement on the body camera recording as proof of what he thought or did, since Burdette did not testify. Thereafter, the trial court admonished the jury not to consider Burdette's statement to prove the truth of what he says happened that day.

Ultimately, the jury concluded that Burdette acted wantonly, and convicted him of murder, four counts of wanton endangerment in the first degree, operating a motor vehicle while under the influence, and failure to give right-of-way to a stopped emergency vehicle. The trial court imposed the jury's

7

recommended sentence of twenty-seven years' imprisonment. This appeal followed.

## II. Analysis

On appeal, Burdette does not challenge the sufficiency of the evidence presented. Rather, he argues the trial court made numerous erroneous rulings which he claims resulted in a fundamentally unfair trial. Upon thorough review of Burdette's claims and the record, we affirm.

### a. The trial court's evidentiary rulings

Burdette argues that the trial court abused its discretion with respect to three evidentiary rulings, each which will be discussed in turn. He contends the evidence should not have been admitted as it did not satisfy KRE[4] 401's relevancy threshold and KRE 403's balancing test.

A basic rule of evidence is that evidence must be relevant to be admissible. KRE 401 provides that evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence." As the gatekeeper, the trial court must make a threshold determination if the proffered evidence is relevant under KRE 401. If relevant, then KRE 403 requires the trial court to assess whether its "probative value is substantially outweighed by the danger of undue prejudice." This assessment, commonly referred to as the "KRE 403 balancing test" ensures that relevant

---

[4] Kentucky Rules of Evidence.

8

evidence will not be admitted when its value is substantially outweighed by the danger of unduly prejudicing the jury. We will apply these basic principles below as they related to Burdette's various claims of error.

### i. The trial court did not abuse its discretion in admitting five autopsy photos.

Burdette first challenges the trial court's admission of five autopsy photos introduced by the Commonwealth through the testimony of Dr. William Ralston III, the chief medical examiner for the Commonwealth who performed Det. Mengedoht's autopsy. Prior to Dr. Ralston testifying, Burdette objected to the admission of one photo of Det. Mengedoht's removed trachea as being irrelevant and gruesome, and the other four photos of her charred body as being cumulative, since photos of the crime scene showing her burned body in the car had already been admitted. At a bench conference, the trial court analyzed each photo for its probative worth, hesitating slightly to admit the photo of the removed trachea. But the Commonwealth insisted the trachea photo was relevant to illustrate the cause of death and to show that the soot went all the way inside Det. Mengedoht's trachea. The trial court ultimately overruled Burdette's objection and admitted all five photos, stating: "These [photos] will assist the medical examiner in explaining the cause of death. And while they are gruesome, she burned to death . . . Can't sanitize that from the jury. . . . The Commonwealth has eliminated probably 75 pictures, I'm guessing, to get down to those 5. I think that's reasonable."

Thereafter, Dr. Ralston testified as to the nature of Det. Mengedoht's injuries and the cause of her death. He identified the cause of death as smoke

9

inhalation, blunt force and thermal injuries sustained in a motor vehicle collision with a subsequent fire. He further stated that the blunt force injuries were not immediately fatal, and for a period after the collision, Det. Mengedoht was breathing long enough to inhale a fatal amount of smoke. Dr. Ralston was unable to say whether she was conscious or not during this time.

The Commonwealth then introduced and published the five autopsy photos, displaying them on a digital projector next to Dr. Ralston, for a total of four minutes while Dr. Ralston testified. Dr. Ralston discussed the extent of Det. Mengedoht's thermal injuries, while pointing to and referencing the photos. He explained that he had removed the trachea (*i.e.*, windpipe) to look for evidence of smoke inhalation and to determine whether Det. Mengedoht was breathing when the fire started. Dr. Ralston testified that, as shown in the photo, her trachea had soot on the inside, indicative of smoke inhalation. Defense counsel did not cross examine Dr. Ralston.

On appeal, Burdette argues that because he did not contest crashing into Det. Mengedoht's vehicle, killing her, the autopsy photos were unnecessary to explain the cause of death, thereby lessening their probative value. He further argues the autopsy photos were cumulative, as photos of the crime scene and a crime scene video had already been supplied to the jury, showing the fiery crash and Det. Mengedoht's charred and burned body still inside the car. Burdette maintains that the admission of the autopsy photos was not only unnecessary, but unduly prejudicial.

10

The general rule is that "gruesome victim photos are per se admissible subject only to clearly delineated exceptions, such as when the body had been mutilated or has decomposed." *Hall v. Commonwealth*, 468 S.W.3d 814, 822-23 (Ky. 2015). "[A] photograph, otherwise admissible, does not become inadmissible simply because it is gruesome and the crime is heinous." *Staples v. Commonwealth*, 454 S.W.3d 803, 825-26 (Ky. 2014) (affirming admission of five gruesome autopsy photos, as "no more than were reasonably necessary to provide illustration for the medical examiner's testimony and to support her findings [and] relevant as tending to show not only that the child had been fatally injured, but also that the fatal head injury was of a severity almost certain to have been inflicted and not likely to have happened accidentally[]").

Under the general rule, this Court has "many times upheld the Commonwealth's use of autopsy photographs introduced in conjunction with a medical examiner's testimony concerning the cause and manner of a homicide victim's injuries and death." *Id.* at 825. However, autopsy photos are not automatically admissible, even under the general rule:

> Like all evidence, [autopsy photos] are subject to the balancing test of KRE 403: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of undue prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence."

*Hall,* 468 S.W.3d at 823 (quoting KRE 403). Under KRE 403, the trial court must "weigh the probative value of the gruesome photo in question against the harmful effects that might flow from its admission to determine whether the

photo should be excluded notwithstanding the general rule." *Id.  See, e.g., Ragland v. Commonwealth*, 476 S.W.3d 236, 249-50 (Ky. 2015) (admission of 8 crime-scene and autopsy photos in conjunction with medical examiner's testimony was within the trial court's discretion: photos were probative of the victim's injuries, facts which are of relevant to the jury's consideration of Ragland's claim of self-defense.  "And although they depict the victim's battered and decomposed corpse, they are not so inflammatory that their probative value is so substantially outweighed by their prejudicial effect as to require exclusion[]").

The task of weighing the probative value and undue prejudice of proffered evidence is inherently factual and, therefore, within the discretion of the trial court.  *Ross v. Commonwealth,* 455 S.W.3d 899, 910 (Ky. 2015).  This Court reviews a trial court's decision regarding the admissibility of evidence for an abuse of discretion.  *Id.*  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles."  *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

Here, the trial court considered each photo individually, and comparatively, and assessed the purpose for which the photo was being offered.  The trial court noted the number of the Commonwealth's autopsy photos (approximately 75) and determined that admitting the 5 photos at hand was reasonable.  This case is distinguishable from *Hall,* wherein Commonwealth presented a 10-minute police video documenting the crime

12

scene and a total of 43 crime scene and autopsy photographs, 28 of which were admitted over objection. 468 S.W.3d at 820.

In *Hall*, we held that some of the gruesome photos were admissible to allow the Commonwealth to meet its typically onerous burden of proving the *corpus delicti* beyond a reasonable doubt. Indeed, "photos of a victim's corpse are relevant to show the nature of the injuries inflicted on the victim." *Id.* at 825. But the "admission of the entire proffer of 28 photos went well beyond that." *Id.* at 826. The *Hall* court noted that photos depicting the same scene or subject merely from different vantage points were needlessly cumulative, and some photos were left displayed, and magnified, on the digital projector while testimony was elicited about details that did not concern the photos. *Id.* On top of the sheer number of photos admitted in *Hall*, the photos "were not addressed one by one or even in comparison to each other; rather, their admissibility was determined all at once as a group, with no emphasis on their relative or incremental probative value. That is where the trouble lies[.]" *Id.* at 827.

In Burdette's case, the autopsy photos were no doubt gruesome, but "general gruesomeness by itself, while prejudicial, is an insufficient ground to keep out relevant evidence; rather, the gruesomeness must be such that it creates substantial undue prejudice or other harmful consequences that outweigh the probativeness of the evidence." *Id.* Though Burdette naturally wished to prevent the jury from seeing the autopsy photos, the Commonwealth may "prove its case by competent evidence of its own choosing, and the

13

defendant may not stipulate away the parts of the case that he does not want the jury to see." *Id.* (quoting *Pollini v. Commonwealth,* 172 S.W.3d 418, 424 (Ky. 2005)).

Notwithstanding that Burdette admitted to causing Det. Mengedoht's death, the five autopsy photos, and Dr. Ralston's testimony relating to same, were relevant to the Commonwealth's burden of proving the *corpus delicti* beyond a reasonable doubt. The photos were used by Dr. Ralston to illustrate the course and results of his autopsy examination and were presented in a concise manner. *See, e.g., Foley v. Commonwealth,* 953 S.W.2d 924, 935 (Ky.1997) (no reversible error where "the photos were shown only briefly, and were not emphasized in any way"). And with respect to Burdette's argument that the trachea photo was unduly prejudicial, we find that photo no more gruesome than the photos of Det. Mengedoht's burned body. *See, e.g., Ross,* 455 S.W.3d at 911 (holding that "the exposure of the intestines does not substantially increase the offensiveness of the photographs, nor is it likely the intestines will cause the jury to act on emotion. As between the barely recognizable figure of [victim's] charred body and the intestines protruding therefrom, the sight of the intestines is the least objectionable and provides a perverse respite from the more haunting portions of [victim's] seared body[])".

Furthermore, the five photos at issue were not duplicative of other photos already entered into evidence, or needlessly cumulative. Just because the jury had seen photos and a video of the crime scene does not make these five autopsy photos less probative of the medical examiner's explanation of Det.

14

Mengedoht's injuries and cause of death.  Under the specific facts of this case, we find the KRE 401 relevancy test and the KRE 403 balancing test satisfied and thus affirm the trial court's decision to admit these autopsy photos.

### ii. Admitting evidence of Burdette's texts about purchasing pills illicitly was not an abuse of the trial court's discretion.

Burdette argues that the trial court abused its discretion by allowing Sergeant Omar Lee to testify that Burdette had been texting someone (not a doctor) about purchasing prescription pills/controlled substances for approximately two years prior to the collision, the last text being on December 9, 2018**, less than two weeks before the collision**.  Burdette preserved this claim by filing a motion in limine in response to the Commonwealth's Notice of Intent to Introduce Evidence of Other Acts Pursuant to KRE 404(b).  Burdette also renewed his objection at trial.  Accordingly, this Court will review the trial court's decision to admit this evidence for an abuse of discretion.  *Ross,* 455 S.W.3d at 910.

KRE 404(b) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  Generally, a defendant's prior bad acts are inadmissible because "[u]ltimate fairness mandates that an accused be tried only for the particular crime for which he is charged.  An accused is entitled to be tried for one offense at a time, and evidence must be confined to that offense. . . . The rule is based on the fundamental demands of justice and fair play."  *Clark v.*

15

*Commonwealth*, 223 S.W.3d 90, 96 (Ky. 2007) (quoting *O'Bryan v.*

*Commonwealth*, 634 S.W.2d 153, 156 (Ky. 1982)).

KRE 404(b) was designed to preclude the admission of character or

propensity evidence, offered to show "that on other occasions a person has

acted in a particular way" and thus is "the sort of person who does that sort of

thing or acts that way" therefore he or she "is likely to have done the same sort

of thing or acted that same way on the occasion at issue in the case." *Trover v.*

*Estate of Burton*, 423 S.W.3d 165, 172 (Ky. 2014).

While KRE 404(b) is a rule of exclusion, such evidence may be

admissible:

> (1) If offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident; or
> (2) If so inextricably intertwined with other evidence to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party.

KRE 404(b).

To determine the admissibility of prior bad evidence, the following three-

step analysis is utilized:

> 1) If the other crimes evidence relevant for some purpose other than to prove the criminal disposition of the accused?
> 2) Is the evidence sufficiently probative to warrant its introduction?
> 3) Does the potential for prejudice from the use of the other crimes evidence outweigh its probative value?

*Bell v. Commonwealth*, 875 S.W.2d 882, 889-91 (Ky. 1994).

Sgt. Lee testified that after receiving Burdette's lab report with the results

of the blood test, investigators checked the Kentucky All-Schedule Prescription

16

Electronic Reporting System ("KASPER") database to see if he had a prescription for either hydrocodone or clonazepam, which he did not. Sgt. Lee stated that the next line of inquiry was to determine where Burdette had obtained the pills, so they inspected his phone for any leads. Sgt. Lee stated that "[t]here was communications via text messages from November 2016 leading up to December 9, 2018. There was multiple text messages where Mr. Burdette had contacted someone who was not a doctor to purchase . . . drugs." He then added that the drugs were "prescription drugs or controlled substances."

Prior to Sgt. Lee testifying, the trial court conducted a hearing on whether such testimony would be admissible, specifically balancing its relevancy, probative value, and prejudicial effect. Burdette argued that the texts did not bear on whether he was impaired at the time of the collision, or even whether the pills he was texting about purchasing were the same drugs in his system on the day of the incident. Because Sgt. Lee's testimony was vague as to what type of pills the texting parties were discussing, Burdette argued the probative value diminished and the prejudicial effect increased. Burdette asserted that this text message evidence is the heart of what KRE 404(b) is designed to prohibit: evidence that because Burdette had done these bad acts in the past, it makes it more likely that he was doing these bad acts now.

The Commonwealth argued that the testimony about the texts was admissible for the limited purpose for which it was being offered: to show Burdette's knowledge on December 24, 2018 when he got behind the wheel of

17

his vehicle. The Commonwealth argued his knowledge directly related to its burden of proving he acted wantonly, *i.e.*, with extreme disregard to human life.[5] The Commonwealth asserted that the text messages established that Burdette did not have a prescription for these pills; that he deliberately took great measures to obtain them, not just once but numerous times over a two-year period; and that he undertook these actions all the while knowing that he was prohibited from doing so by the terms of his employment, and under the law, but did it anyway.[6]

The trial court ultimately agreed with the Commonwealth, concluding that the evidence was not being offered to show Burdette was a drug addict or had bad character, or even that he was impaired on the day of the incident. Rather, the texts were being offered to show the measures Burdette took to obtain the pills, which the trial court found increased the level of wantonness; Burdette knew how dangerous it was to ingest controlled substances while driving and knew he was prohibited from doing so, but yet went to great lengths again and again to disregard that risk and obtain and ingest them anyway. Specifically, the trial court reasoned,

---

[5] "A person is guilty of wanton endangerment in the first degree when, under circumstances manifesting extreme indifference to the value of human life, he wantonly engages in conduct which creates a substantial danger of death or serious physical injury to another person." KRS 508.060(1).

[6] Testimony at trial established that Burdette was not permitted to operate a commercial vehicle while taking controlled substances. To maintain his commercial vehicle license, Burdette was not permitted to drive with any measurable amount of drugs in his system. Further, Kentucky law generally prohibits texting and driving under KRS 189.292(2).

In the big picture, a person who doesn't have a prescription for a narcotic, who can't have a prescription for a narcotic and do their job, but wants a narcotic, has to find a different source. And all that's important in this case because all that shows knowledge. It shows a disregard of what a medical doctor would have said had that person gone there to get that prescription medication, and there was a record of it. . . .

The level of disregard – and arguably the wantonness – increases in proportion to your awareness of the risk. And so the more you know about it, the more you have to disregard in order to do it. And the argument follows that the, the greater the lengths that you go to procure this, the more wanton it is. If someone gives it to you, it's different than you going out to get it. If it's somebody else's prescription and you have easy access to it, it's still wanton, but it's not the same as having to fly out of the country and come back with a suitcase full of it, because every second that you're engaged in that activity is time you have not to do it anymore and turn around and stop.

The trial court determined that any prejudice was minimal because the jury had already heard evidence that Burdette had illegally obtained the pills that were in his system on the day of the collision and that he should not have been taking them while driving. The trial court's only hesitation in admitting the evidence was that no testimony would be presented about what type of pills Burdette was purchasing, and thus the jury would be required to make an inference.

On appeal, Burdette emphasizes that knowledge in the context of KRE 404(b) often means "capacity to commit the act." *Southworth v. Commonwealth*, 435 S.W.3d 32, 49 (Ky. 2014). He claims that the text messages merely show his capacity to obtain pills without a prescription, which he argues is not relevant to whether he had the capacity to drive under the influence. Burdette maintains that because he was not charged with a crime

19

relating to purchasing, trafficking, or being in possession of pills, the evidence that he did so in the past had no bearing on whether he drove under the influence on the day of the collision. Furthermore, he points out that no evidence showed that the pills he purchased in the two-year span were the same as those in his system on the day of the collision. Instead, he contends that the test messages are propensity evidence unrelated to the charged offenses and were highly prejudicial.

A person acts wantonly "when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists." KRS 501.020(3). Further, a person who creates such a substantial and unjustifiable risk but "is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto." *Id.* Whether Burdette's wanton conduct manifests "extreme indifference to human life" is a question to be decided by the trier of fact. *Brown v. Commonwealth,* 975 S.W.2d 922, 924 (Ky. 1998).

In *Ramsey v. Commonwealth,* the Court held that the defendant driving while intoxicated and with a child in the car can support a conviction for first-degree wanton endangerment. 157 S.W.3d 194, 197 (Ky. 2005). In reaching that conclusion, the Court noted that the defendant "was not simply driving under the influence as he tried to argue," since "*his physical acts of driving included more than one reported lapse: it was his third time of operating a motor vehicle despite a license suspension for DUI*; he was driving while intoxicated; he suddenly accelerated the vehicle at a speed noticeably higher than the

20

normal; and he turned off the vehicle's headlights while still on the road." *Id.*

at 198 (emphasis added). Thus, the *Ramsey* court considered the defendant's

prior driving offenses in determining whether his conduct was wanton.

On the other hand, in *Shouse v. Commonwealth*, a murder trial

concerning a child's death while left unattended in the car by his mother, this

Court held that it was error to introduce, pursuant to KRE 404(b), the fact that

Shouse had left her child in her car unattended in the past. 481 S.W.3d 480,

490 (Ky. 2015). Specifically,

> Proof that Shouse had previously intentionally left her son in the
> car for short periods does not show that she wantonly did so on
> the night in question. Indeed, the proof indicates that she was not
> even aware that she had left the child in the car. To be proper KRE
> 404(b) evidence, her prior acts must show more than mere
> propensity to do an act, and must prove something else, such as
> motive, knowledge, absence of mistake, or identity.
>
> The Commonwealth does not expressly argue any of these
> grounds, saying only that the acts "illuminate what was in her
> mind when she left her child in the car and killed him." But the
> prior acts cannot show Shouse's wanton mental state, specifically
> that she knew of the risk involved and consciously ignored that
> risk, because they differed too much from what happened here. If
> anything, that she had safely left her child in the car in the past—
> without injury, much less death—would tend to show that she
> was *unaware* of the risk of leaving the child in a car.

*Id.* at 490–91. The Court concluded such evidence was propensity evidence -

used only to show that Shouse had a propensity for leaving her son in the car –

which is forbidden by KRE 404. Nonetheless, the Court found the evidence to

be harmless since no substantial likelihood existed that it affected the verdict.

*Id.* at 491.

21

In *Feinauer v. Commonwealth*, the Court of Appeals reversed the defendant's reckless homicide convictions on grounds that the trial court improperly allowed the Commonwealth to introduce text messages evidencing prior bad acts by Feinauer that were insufficiently tethered to the reckless homicide charges. 640 S.W.3d 47 (Ky. App. 2021), review denied (Mar. 16, 2022). In *Feinauer*, the defendant was on route to attend an event at her child's school when her vehicle left her lane of traffic and collided head-on with a vehicle traveling in the opposite direction, tragically killing both occupants. *Id.* at 48. Feinauer's subsequent blood draw revealed a blood alcohol level of 0.048%; no alcohol was detected in the subsequent draws, nor were any drugs detected in any draws. *Id.* at 49.

At trial, the court admitted "about fifteen texts, dating from November 2015 to March 2016, [Feinauer] had sent regarding speeding, drinking and driving, and/or texting and driving." *Id.* The Commonwealth argued the texts showed Feinauer's "consciousness of guilt since they, generally speaking, show she knew it was wrong to drink and drive, text and drive, or speed." *Id.* However, the Court of Appeals observed that "'everyone is presumed to know the law; therefore, ignorance of the law is not an excuse.' So, the Commonwealth did not need the texts to show that Feinauer knew speeding, texting and driving, and having open alcoholic beverages in a vehicle are illegal because she, like everyone else, was already conclusively presumed to know the law." *Id.* at 51 (quoting *Department of Revenue, Finance and Administration*

22

*Cabinet v. Revelation Energy, LLC*, 544 S.W.3d 170, 176 (Ky. App. 2018))

(internal citations omitted).

Importantly, the Commonwealth did not charge Feinauer with speeding, driving while impaired, texting while driving, or even for having an open container of alcohol in her vehicle at the time of the crash. 640 S.W.3d at 50. Nor did it introduce evidence of such at trial. *Id.* at 51. Accordingly, the Court of Appeals discerned "no element(s) of reckless homicide for which the texts had material, probative value" since the "evidence that she had drunk while driving, texted while driving, or sped in the past . . . has no meaningful relationship to whether she did so at the time of the fatal collision." *Id.* Rather, "the prior instances of misconduct exemplified by the texts seem designed to show that Feinauer had a propensity for making poor decisions while driving." *Id.* Given the emotionally charged nature of the case, with the Commonwealth using the texts "to argue *repeatedly* that Feinauer played a deadly game of 'Russian roulette' whenever she drove a vehicle[,]" the court concluded that admission of the texts was not harmless error. *Id.* at 52.

In Burdette's case, the trial court reasoned that his conduct became more and more wanton the longer he did it, and the greater the lengths he went to obtain pills illicitly. Whether the prejudicial effect of this evidence substantially outweighed its relevancy and probative value is, as it often is, a close call. After thoroughly reviewing relevant case law and the record, we make particular note of the fact that the most recent text was within two weeks of the date of the collision, and we are accordingly unable to say that the trial

23

court's decision was "arbitrary, unreasonable, unfair, or unsupported by sound legal principles" so as to qualify as an abuse of discretion. *English*, 993 S.W.2d at 945. Moreover, considering the entirety of the evidence presented to the jury about Burdette's guilt, including his blood test results showing he had hydrocodone and clonazepam in his system and evidence that he was watching pornography at the time he slammed into the back of Det. Mengedoht's vehicle, which had its flashing lights activated, hardly braking, shows his conduct was wanton beyond a reasonable doubt. As a result, even if the trial court did err in admitting evidence of the texts, any error was harmless and did not substantially affect the outcome of the trial. *See Meece v. Commonwealth*, 348 S.W.3d 627, 645 (Ky. 2011) ("[p]reserved evidentiary and other non-constitutional errors will be deemed harmless . . . if we can say with fair assurance that the judgment was not substantially swayed by the error[]").

### iii. The trial court did not abuse its discretion in admitting evidence of the content of the video (pornography) that Burdette was watching at the time of the collision.

Burdette argues that the trial court ran afoul of KRE 404(b) by allowing the Commonwealth to refer to several instances in which Burdette accessed a pornographic video on the website "xvideos.com" on the day of the collision, including during the collision. Burdette claims that the description of the video's pornographic content was irrelevant to the issue of whether he was looking at his phone at the time of the collision; likewise, he asserts that his browser history from earlier that day was also irrelevant. Under KRE 403's balancing test, Burdette argues this evidence was more prejudicial than

24

probative. This claim is preserved, as Burdette filed a motion in limine to exclude this evidence, in response to the Commonwealth's KRE 404(b) Notice. The trial court conducted a hearing on its admissibility and ultimately allowed testimony regarding the pornography video, but not the title of the video. Burdette renewed his objection at trial, which the court overruled on grounds that the video was a visual medium, the contents of which go to the attention one might pay to the video, how engaged one might be, and one's anticipated reaction to watching such a video. We review the trial court's ruling for an abuse of discretion. *Ross,* 455 S.W.3d at 910.

At trial, Det. Gabhart described the forensic examination that he conducted of Burdette's phone and explained that Burdette had accessed a pornographic website – "xvideos.com" – during the collision. He further testified that Burdette had visited it five other times earlier that day, before the collision: at 8:53 a.m., 10:02 a.m., 12:33 p.m., 1:08 p.m., and 1:36 p.m. Det. Gabhart described the pornographic video as depicting a male and female in a variety of sexual positions, engaging in oral sex and vaginal sex. The Commonwealth also offered testimony regarding the pornographic video through Sgt. Lee, who testified that Burdette accessed the website "xvideos.com" at 2:12 p.m. on the day of the collision. Sgt. Lee stated that the video was eight minutes long and depicted one male and one female engaged in various sexual acts.

The Commonwealth asserts that the content of the video was admissible under KRE 404(b)(2) as it was inextricably linked to the crime and admissible

25

under KRE 404(b)(1) to show that because Burdette visited that website several other times that day, Burdette did not access the video mistakenly. Specifically, the Commonwealth argues that Burdette streaming pornography during the collision formed part of the central question of the case: whether a person who watches pornography while driving a vehicle – much less someone who does so while operating a semi-truck on the interstate – unquestionably engages in wanton behavior. And that the other times Burdette watched pornography that day was probative of the absence of mistake or accident, and to eliminate any inference that Burdette's phone could have automatically played the video during the collision.

We agree with the trial court that this evidence was admissible. As the trial court reasoned, pornography by its nature is a visual medium requiring one's attention and produces a reaction. Driving while playing a pornographic video on your phone demands a different type of engagement than driving while, say, having a history channel video playing in the background, in which the audio content is the focus, and the driver need not look at the phone to absorb its content. Thus, Burdette having a pornographic website streaming during the collision is extremely relevant to the Commonwealth's charge of wanton conduct. Further, without evidence that Burdette had visited the same pornographic video five times earlier that day, the jury could have inferred that the website was simply open in his browser, perhaps by accident or from accessing it another day, or just not closing the browser. Thus, that evidence was admissible not only to show absence of mistake but was as inextricably

26

linked to the crime - necessary and probative to provide the jury with a full picture of Burdette's actions leading up to, and during, the fatal collision. *Cf. Metcalf v. Commonwealth*, 158 S.W.3d 740 (Ky. 2005) (detectives could have testified in defendant's trial on charges of sodomy and sexual abuse of a different victim, without mentioning that defendant had videotaped his stepdaughter undressing).

While pornographic evidence is undoubtedly prejudicial, *see Chavies v. Commonwealth*, 374 S.W.3d 313, 323 (Ky. 2012) (noting the "dangerous quality and prejudicial consequences" from this type of evidence), here the prejudice was limited and was greatly outweighed by its probative value. No one identified the title of the video or testified that Burdette had a history of watching pornographic videos while driving or was a porn addict; instead, the evidence merely showed that Burdette viewed the same pornographic video several times on the day of the collision, including immediately before. The evidence was thus properly admitted.

### b. The trial court did not err by allowing the jury to view the vehicles involved in the collision.

Burdette argues that the trial court erred by allowing the jurors to leave the courtroom to go outside and view the three vehicles involved in the collision on a street behind the courthouse. This claim is preserved as Burdette objected to the Commonwealth's Notice Regarding Physical Evidence That Cannot be Presented in the Courtroom and renewed his objection during trial.

27

Accordingly, we review the trial court's decision to allow the jurors to view the vehicles for an abuse of discretion. *Ross,* 455 S.W.3d at 910.

The Commonwealth sought to introduce the vehicles pursuant to KRS 29A.310(3), which provides: "When necessary the judge may authorize the jury to view the real property which is the subject of the litigation, or the place in which any material fact occurred, or the place in which the offense is charged to have been committed." The Commonwealth argued that by viewing the vehicles in person the jury would be better able to appreciate the difference in their size and factor that into assessing the level of wanton conduct on the part of Burdette. In other words, the Commonwealth stated that there was a difference in the level of wanton conduct between consuming pills like Burdette did and driving a tanker truck versus driving a car the size of a sedan. The trial court found that everyone would be better off by allowing the jury to see the vehicles in person and ordered the street behind the courthouse to be blocked off by police so there would be no chance of the public, or anyone with an emotional connection to this case, viewing the vehicles and contaminating the jury.

Burdette now argues that KRS 29A.310 does not apply to this case, since vehicles are not real property, *see Property*, Black's Law Dictionary (11th ed. 2019) (defining real property as "land and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land"). He claims not only was the trip to view the vehicles not authorized under KRS 29A.310, it also did not pass muster under KRE 403. He points out

28

that the Commonwealth introduced ample evidence of the size and physical qualities of the vehicles, including testimony that a tanker truck weights up to 30,000 pounds, as well as scene videos and photographs. Taking this into consideration, Burdette maintains that the viewing of the vehicles in person had little probative value and only served to inflame the passions of the jury.

The Commonwealth concedes on appeal that the vehicles are not "real property" within the meaning of KRS 29A.310(3). Nonetheless, it asserts the vehicles were substantive evidence necessary to tell the full story of the charges against Burdette. *See Barnett v. Commonwealth*, 979 S.W.2d 98, 103 (Ky. 1998) (generally, "the prosecution is permitted to prove its case by competent evidence of its own choosing[]").

Burdette cites to two cases in support of his position, neither of which is directly on point since they concern a jury viewing the place where the crime occurred pursuant to KRS 29A.310. In *Debruler v. Commonwealth*, this Court held that the trial court did not abuse its discretion by refusing to allow the jury to view a scene of a robbery and kidnapping. 231 S.W.3d 752, 761 (Ky. 2007). Because the Commonwealth had introduced multiple photographs and maps of the scene, the Court found that "the jury was adequately apprised of the physical nature of the two scenes[.]" *Id.*

In *Tungate v. Commonwealth*, this Court similarly affirmed the trial court's decision not to allow the jury to view a daycare where a sexual assault had allegedly occurred. 901 S.W.2d 41, 44 (Ky. 1995). The trial court reasoned that it had been over two or three years since the crimes allegedly

29

occurred there and that the jury had been provided with photographs and a video of the scene. *Id.* This Court affirmed, finding that the jury was familiar with the scene from the testimony and visual aids. *Id.*

However, these cases are distinguishable from Burdette's, and not just because they involve KRS 29A.310(3). While perhaps not *necessary* for the jury to view the three vehicles in person, that viewing was helpful and probative to the jury's assessment of Burdette's conduct on the day of the incident and the extent to which he acted wantonly. Considering the parameters set in place by the trial court to minimize any potential taint on the jury, we find any prejudice was minimized. Accordingly, we decline to disturb the trial court's decision on this issue.

### c. The trial court did not err by denying Burdette's motions to suppress.

The Commonwealth obtained Burdette's medical records from LMDC through a grand jury subpoena, which Burdette moved to suppress those records and any statements made therein. The trial court denied his motion and allowed two witnesses to testify about Burdette's statements contained in the medical records, in which he admitted taking hydrocodone "sometimes" and consuming it the day of the collision. We review a trial court's ruling on a suppression motion utilizing a clear error standard for factual findings and a *de novo* standard for conclusions of law. *Sykes v. Commonwealth*, 453 S.W.3d 722, 724 (Ky. 2015).

At trial, the Commonwealth called two witnesses, Nurse McCarthy and LMDC records custodian Darlene Jerman, to testify about statements made by

30

Burdette which were contained in the LMDC medical records. Nurse McCarthy testified that he drew Burdette's blood pursuant to the search warrant and conducted a routine medical intake assessment of Burdette, which he performs on every detainee booked into the LMDC jail facility. During Burdette's assessment, Nurse McCarthy asked him if he had ingested any drugs or medications and Burdette responded that he had consumed hydrocodone that day (December 24, 2018) and "he takes it sometimes." Nurse McCarthy testified that every inmate is asked about ingesting drugs or medications because LMDC needs to know about any potential overdoses or withdrawals.

Darlene Jerman testified that she was one of the custodians of the medical records for LDMC. She testified as to the contents of Burdette's medical records from December 24, 2018; specifically, Burdette responding "yes" when asked "Do you use drugs not prescribed by a physician?" Burdette also stated he used hydrocodone "sometimes" and that December 24, 2018 was his "last use."

On appeal, Burdette claims the trial court abused its discretion by denying his motion to suppress Nurse McCarthy's and Jerman's testimony about his statements contained in his medical records. He alleges their testimony violated his rights under the Fourth Amendment of the United States Constitution and Section 10 of the Kentucky Constitution, as well as the Fifth Amendment of the United Constitution and Section 11 of the Kentucky Constitution. Specifically, Burdette claims that the Fourth Amendment and Section 10 were violated by the release of his LMDC medical records without a

31

warrant (thereby violating his alleged expectation of privacy in those records), and by what he classifies as an interrogation by Nurse McCarthy without him being *Mirandized* first. Burdette further alleges his privilege against self-incrimination under the Fifth Amendment and Section 11 were violated by the intake assessment process, in which he was compelled to answer Nurse McCarthy's questions because he would have been denied adequate medical care otherwise.

Both the Fourth Amendment and Section 10 protect citizens from unreasonable searches and seizures. Burdette asserts that he had a legitimate privacy interest in his medical records protected by the Fourth Amendment and that "[t]he grand jury is [] without power to invade a legitimate privacy interest protected by the Fourth Amendment." *United States v. Calandra*, 414 U.S. 338, 346 (1974). Accordingly, he argues that his statements contained in the LMDC medical records – the intake assessment - should have been suppressed.

The Commonwealth argues that the intake assessment was part of the routine booking process at LMDC that was administrative in nature and performed on every detainee. It argues that Burdette's expectation of privacy in these records is not reasonable and thus no warrant was required to obtain them. Additionally, it asserts that the LMDC intake assessment falls within the

32

booking exception to *Miranda v. Arizona*, 384 U.S. 436 (1966) and thus the state was not required to *Mirandize* Burdette beforehand.[7]

With respect to Burdette's alleged expectation of privacy in his LMDC medical records, the trial court found that Burdette was not actively seeking medical treatment; rather, the booking process was attendant to his arrest and required obtaining medical information from him for administrative purposes. Absent any Kentucky case law holding that *Miranda* applies to a nurse's questions during booking, the trial court concluded that Nurse McCarthy and Jerman could testify as to Burdette's statements contained in the records, but that the Commonwealth could not admit the records themselves into evidence.

Application of the Fourth Amendment and Section 10 "depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable,' or 'legitimate expectation of privacy' that has been invaded by government action." *Smith v. Maryland*, 442 U.S. 735, 740 (1979). Burdette argues that the U.S. Supreme Court has recognized a reasonable expectation of privacy in a person's medical records; specifically, "[t]he reasonable expectation of privacy enjoyed by the typical patient undergoing diagnostic tests in a hospital is that the results of those tests will not be shared with nonmedical personnel without her consent." *Ferguson v. City of Charleston*, 532 U.S. 67, 78 (2001). Burdette contends that while his statements were procured

---

[7] Neither party addresses when Burdette was read his *Miranda* rights, and when/if he invoked his right to counsel. We are left to assume he was *Mirandized* upon his arrest, and he is now claiming he should have been *Mirandized* again before the intake assessment.

33

attendant to his incarceration, that should not minimize his expectation of privacy; for if an inmate has no legitimate privacy interest in those records, then inmates will be incentivized to hide medical conditions that they believe might be incriminating or be forced to choose between obtaining medical treatment they need or being convicted of a crime with their own medical information.

While inmates are afforded constitutional rights, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system." *Sandin v. Connor*, 515 U.S. 472, 485 (1995) (quoting *Jones v. N.C. Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). By extension, "[l]oss of freedom of choice and privacy are inherent incidents of confinement in such a facility." *Bell v. Wolfish*, 441 U.S. 520, 537 (1979). Along these lines, the U.S. Supreme Court has held that "society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell[.]" *Hudson v. Palmer*, 468 U.S. 517, 526 (1984). The *Hudson* court explained,

> A right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells required to ensure institutional security and internal order. We are satisfied that society would insist that the prisoner's expectation of privacy always yield to what must be considered the paramount interest in institutional security.

*Id.* at 527–28 (footnote omitted).

Burdette correctly notes that some federal circuits have recognized the constitutional right to privacy in one's medical information exists in prison. *See, e.g., Doe v. Delie*, 257 F.3d 309, 317 (3d Cir. 2001); *Powell v. Schriver,* 175 F.3d 107, 112 n.3 (2d Cir. 1999); *Anderson v. Romero,* 72 F.3d 518, 522 (7th Cir. 1995). Even so, "a prisoner does not enjoy a right of privacy in his medical information to the same extent as a free citizen. . . . [A prisoner's] constitutional right is subject to substantial restrictions and limitations in order for correctional officials to achieve legitimate correctional goals and maintain institutional security." *Delie,* 257 F.3d at 317. Indeed, "[i]nmates retain those rights that are not inconsistent with their status as prisoners or with the legitimate penological objectives of the corrections system." *Id.* at 315 (citing *Pell v. Procunier,* 417 U.S. 817, 822 (1974)).

As the trial court reasoned, Burdette was not a "typical patient" and his expectation of privacy in the LMDC records is different from the privacy interest he would enjoy if voluntarily seeking medical treatment at a hospital or doctor's office. Here, the medical intake assessment of Burdette stemmed from his arrest and directly pertained to penological interests in ensuring the safety of inmates and the security of the jail facility. "The limits on an inmate's expectations of privacy are particularly strong where the information he seeks to protect relates to the institutional safety of the prison." *Payne v. Taslimi,* 998 F.3d 648, 659 (4th Cir. 2021). We agree with the trial court that Burdette's alleged privacy interest in these records was not reasonable, given

35

the circumstances. Thus, no warrant was required for the state to obtain those records.

As to whether Burdette should have been read his *Miranda* rights before the intake assessment, this depends on whether Nurse McCarthy was a state actor whose questioning amounted to a custodial interrogation. Under *Miranda v. Arizona*, "a person in custody must be informed of their rights before they are interrogated." *Jones v. Commonwealth*, 641 S.W.3d 162, 169 (Ky. 2022) (citing *Miranda*, 384 U.S. at 498-99). "Law enforcement enjoys a limited exception to *Miranda* in the context of booking and arrest. Questions that fall under the booking exception to *Miranda* are those 'reasonably related to the police's administrative concerns." *Id.* (quoting *Pennsylvania v. Muniz*, 496 U.S. 582, 601–02 (1990)). Administrative concerns include "information whose usefulness is related to record-keeping, incarceration, and pre-trial services." *Id.* (citing *Dixon v. Commonwealth*, 149 S.W.3d 426, 432 (Ky. 2004)). To be administrative in nature "its immediate purpose [must be] 'divorced from the State's general interest in law enforcement.'" *Williams v. Commonwealth*, 213 S.W.3d 671, 682 (Ky. 2006) (quoting *Ferguson*, 532 U.S. at 79). As we noted in *Jones*, the U.S. Supreme Court "'has been reluctant to circumscribe the authority of the police to conduct reasonable booking searches,' giving officers some latitude when arresting and booking individuals accused of a crime." 641 S.W.3d at 169-70 (quoting *Maryland v. King*, 569 U.S. 435, 456 (2013)).

The first step in determining if the booking exception applies is whether Nurse McCarthy qualifies as a state actor, as *Miranda* warnings are only required if the state is interrogating someone in custody to gather incriminating information.  As the party seeking suppression of evidence, the burden of proof was on Burdette to present sufficient proof to establish that Nurse McCarthy was a state actor, and the intake assessment was a custodial interrogation.  *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (holding that "[i]t is well settled that in seeking suppression of evidence the burden of proof is upon the defendant to display a violation of some constitutional or statutory right justifying suppression[]").

Burdette alleges that Nurse McCarthy was a state actor because he assisted the police in executing a search warrant to obtain a blood sample, was aware of the charges filed against Burdette, and knew the potentially incriminating effect of the questions he was asking during the intake assessment.  Because of this, Burdette argues that Nurse McCarthy's role exceeded standard medical care because he assisted the police in gathering information to prove the intent of wanton murder.

The Commonwealth stresses that Nurse McCarthy was not a state actor, noting that he was employed by WellPath, a company that contracts with LMDC to provide medical care.  The Commonwealth further contends that no evidence was presented that officers had instructed Nurse McCarthy to gather incriminating information, or that Nurse McCarthy was working on behalf of, or under the influence of, law enforcement.  Even if deemed a state actor, the

37

Commonwealth argues that the booking exception applies as the information Nurse McCarthy collected from Burdette during the assessment was for administrative purposes only.

As an initial matter, Nurse McCarthy's employment by WellPath, rather than LMDC, does not automatically exempt him from being a state actor. *Compare Welch v. Commonwealth*, 149 S.W.3d 407, 409-11 (Ky. 2004) (counselors assisting with the sex offender treatment program "were state actors") *with Fields v. Commonwealth*, 12 S.W.3d 275, 284 (Ky. 2000) ("[t]he mere fact that the police transported Appellant to King's Daughter's Hospital for treatment of his wounds did not, *ipso facto*, transform Dobson from a hospital employee into a state actor[]"). Rather, we must discern the nature and purpose of the questions asked by Nurse McCarthy.

Undoubtedly, Nurse McCarthy is not a law enforcement officer.

> Questioning by a party who is not a law enforcement officer may constitute a "custodial interrogation" (which entails state action) in two primary circumstances. The first is when the private entity is operating in accordance with a court order or governmental regulation and is thereby properly viewed as a "state actor."

*Adkins v. Commonwealth*, 96 S.W.3d 779, 791 (Ky. 2003). In *Estelle v. Smith*, the U.S. Supreme Court held that an interrogation conducted by a court-appointed competency psychiatrist at the county jail was "a phase of the adversary system," thereby triggering the defendant's *Miranda* rights. 451 U.S. 454, 467 (1981). *See also Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 614–16 (1989) (holding that heavy government regulation transformed the private railway's drug testing into a "search" for purposes of the Fourth

38

Amendment).  The second circumstance in which state action occurs is "when the government otherwise 'exercised such coercive power or such significant encouragement that it is responsible for [the private party's] conduct.'"  *Adkins*, 96 S.W.3d at 791 (quoting *United States v. Garlock,* 19 F.3d 441, 443 (8th Cir. 1994)).

We find Nurse McCarthy was a state actor since the intake assessment was conducted at the LMDC facility, and directly pertained to its penological interests.  That said, we find the booking exception to *Miranda* applies.  In the absence of Kentucky precedent on whether a jail nurse's questions during booking qualify for the booking exception, we find two cases cited by the Commonwealth to be persuasive and helpful to our analysis.  The first is an Alabama case, in which that state's court of appeals held that a suspect's recent use of controlled substances, as admitted through the testimony of a jail nurse who drew the defendant's blood and obtained a urine sample during the routine intake assessment of inmates, fell within the booking exception to *Miranda* and was admissible.  *Henderson v. State*, 248 So.3d 992, 1032-34 (Ala. Crim. App. 2017) ("questions asked as part of the routine booking procedure do not fall within the protections of *Miranda*") (citing *Pennsylvania v. Muniz,* 496 U.S. 582 (1990)).  In *Henderson*, the jail nurse (McGinnis) testified, in relevant part,

> she was employed at the Russell County jail and that her contact
> with Henderson came as a result of her job to evaluate him as a
> new inmate; that the evaluation took place in the infirmary at the
> Russell County jail; that she asked Henderson questions during
> the evaluation and that none of the law-enforcement officers who

39

were also in the room directed her to ask any of those questions, including when he last consumed drugs or alcohol; and that her questions to Henderson related to his medical history and had nothing to do with the case. McGinnis testified that Henderson told her that he only used marijuana and alcohol and that he had ingested neither in the two days before the incident.

*Id.* at 1032.

Burdette asks us not to consider *Henderson* since in that case, the jail nurse did not assist police, and the prosecutor introduced the nurse's statements in that case on rebuttal, rather than during its case-in-chief, as the Commonwealth did here. However, we find that distinction irrelevant for our purposes, and the facts and legal analysis of the *Henderson* court nevertheless helpful. That court found:

Much like conducting a routine booking procedure, McGinnis was performing the intake evaluation she conducted on every newly admitted inmate, and the questions she asked Henderson were no different than those she asked every new inmate. McGinnis testified that law-enforcement officers did not direct her to ask any questions. She said that no one threatened, coerced, or offered any hope of reward to Henderson to make him answer her questions.

*Id.* at 1033.

The second case the Commonwealth cites is an Oregon case, *State v. Montiel-Delvalle*, in which that state's court of appeals confronted a similar situation, where an officer asked an arrestee who was suspected to have been involved in a collision about his injuries. 304 Or. App. 699, 714, 468 P.3d 995, 1005 (2020). That court affirmed the trial court's denial of the defendant's motion to suppress the statements he made to the officer on the night of his arrest, since the officer's questions were not designed to elicit incriminating

40

information and therefore the booking exception to *Miranda* applied. *Id.* at 1005-06. The *Montiel-Delvalle* court reasoned,

> If anything, having reason to believe that a person *is* injured or *is* suffering a medical condition makes it more important from an administrative perspective to determine the nature and severity of the injury or condition before placing the person in jail. . . . [The officer's] recognition that defendant might have injuries related to the car crash did not preclude him from asking questions normally attendant to arrest and booking that served reasonable administrative purposes.

*Id.* at 1006.

Burdette attempts to distinguish *State v. Montiel-Delvalle* on the basis that he did not have any visible injures requiring medical attention, but that distinction does not bear on our take-away from *State v. Montiel-Delvalle*: in determining whether the booking exception applies, the focus should be the purpose of the questions and whether that purpose was administrative in nature or simply designed to elicit an incriminating response.

Here, Nurse McCarthy's routine intake assessment questions served an administrative purpose, that is, to provide the state with the information necessary to attend to an inmate's medical needs while in police custody. He exercised no discretion in the questions asked of Burdette during the booking process, as they were set forth on the intake assessment form, nor did the evidence show that officers directed him to ask certain other questions not on the intake form. Contrary to Burdette's assertion, Nurse McCarthy's performance of the blood draw, and his knowledge of the charges against Burdette, did not affect or change his administration of the intake assessment

41

in any way. *See, e.g., Jones,* 641 S.W.3d at 171 ("[w]hether an officer should know that a line of questioning is incriminating and not reasonably related to booking will change depending upon the alleged crime and the extent of an officer's knowledge regarding said crime[]"). Accordingly, the booking exception to *Miranda* applies, and Nurse McCarthy's testimony was admissible on that basis.

As to Burdette's alleged violation of the Fifth Amendment and Section 10, their application likewise requires state action. *See Adkins,* 96 S.W.3d at 790 ("It is well-established that only state action implicates a defendant's rights under the Fifth and Sixth Amendments of the United States Constitution and Section Eleven of the Constitution of Kentucky[]") (internal quotations omitted). We have determined that Nurse McCarthy was a state actor, thus, *Miranda* prohibits the Commonwealth from using "statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda,* 384 U.S. at 444. That is, "a person in custody must receive certain warnings before any official interrogation, including that he has a 'right to remain silent' and that 'anything said can and will be used against the individual in court.'" *Estelle,* 451 U.S. at 467 (quoting *Miranda,* 384 U.S. at 467–69). Here, as we have concluded, the booking exception to *Miranda* applies here and thus Burdette was not required to be *Mirandized* prior to the intake assessment. Thus, the trial court properly denied Burdette's motion to suppress.

42

### d. The trial court's error during Burdette's closing argument was harmless.

Burdette claims the trial court deprived him of his right to present a defense by forbidding him from using proof of a statement of his, already admitted into evidence, to argue during closing argument that his intent was at most reckless, not wanton. He claims the trial court's ruling violated his constitutional rights as set forth in the Sixth and Fourteenth Amendments to the U.S. Constitution and Section 11 of the Kentucky Constitution. This Court reviews a trial court's decisions on the parameters of closing argument, including evidentiary rulings, for an abuse of discretion. *Ross,* 455 S.W.3d at 910; *Sizemore v. Commonwealth,* 42 S.W.2d 328, 329 (Ky. 1931).

During closing argument, defense counsel argued that the Commonwealth failed to prove Burdette acted wantonly and, if anything, the jury may find he acted recklessly. About ten minutes prior to defense counsel making the statement at issue - "Here's why. You heard from Mr. Sobak that clearly he missed something, but you also heard from Roger" - defense counsel made a similar comment - "you will get no dispute from Roger that this was a tragedy" - after which the trial court *sua sponte* called defense counsel to the bench and warned her not to mention her client again like that because Burdette did not testify. The court said, "Please don't do that. You can't invoke what Roger thinks, what Roger says." Still, about ten minutes later, defense counsel, in arguing Burdette's conduct was at most reckless, said, "You also heard from Roger" then immediately played the body camera

43

recording in which Burdette is heard saying, "Last thing I know, I'm not even sure I hit the car first, but I think I did."

At this point, the trial court again *sua sponte* called the parties up to the bench and reiterated that defense counsel cannot use Burdette's statement on the body camera recording as proof of what happened that day. The trial court stated:

> You can't use that to prove that what he said is true, it's absolutely hearsay and it cannot be used as proof of what he says happened; it can only be used against him. It's really improper and now we gotta undo that. The fact that he said it can only be used against him as a matter of law, so I don't know what to do. . . . it's fixable but it has to be fixed because there is no testimony Roger Burdette about what happened that day. . . . you can't use that as substitute for his testimony. That's a bright line rule.

The trial court asked the Commonwealth what it wanted it to do, and the Commonwealth suggested it admonish the jury. Thereafter, the trial court gave the jury the following admonition:

> Folks, this is kind of a big deal. The defendant did not testify. And he has a right not to testify but if he doesn't testify, his testimony is not in evidence. Testimony is where you get on the stand and swear to tell the truth, the whole truth, and nothing but the truth. That's [trial court points at paused video on projector] hearsay and the rule says, very clearly, that what a defendant says off the stand cannot be used by you all to consider that as the truth of the matter asserted. You have no information about, from Roger Burdette that you may consider to prove what he did that day. The rule is very clear that the only purpose, legitimate purpose for using a defendant's statement off the stand who does not testify is against him. The Commonwealth may use that against him. But they may not use that to substitute for testimony. You have not heard from Roger Burdette what happened that day. And you may not consider that statement from Roger Burdette to prove the truth of what he says happened that day. You may not do that and if you cannot do that, you gotta let me know. Does everybody understand the difference? Okay, thank you.

44

While the trial court did not state which rule of evidence it was referring to, we assume it was KRE 801A(b)(1), which provides:

> (b) Admissions of parties. A statement is not excluded by the hearsay rule, even though the declarant is available as a witness, if the statement is offered against a party and is:

> (1) The party's own statement, in either an individual or a representative capacity[.]

Burdette's statement was admitted into evidence as the Commonwealth's Exhibit 3. He argues that forbidding him to draw inferences based on that evidence essentially prohibited him from making arguments about his mental state, which he claims violated his right to present a defense. *See* U.S. Const. amend. VI (in all criminal prosecutions, the accused enjoys the right to have the assistance of counsel for his defense); U.S. Const. amend. XIV § 1 (the government is prohibited from "depriv[ing] any person of life, liberty, or property without due proves of law[]"); Ky. Const. § 11 (ensuring an accused "the right to be heard by himself and counsel" and to not "be deprived of his life, liberty or property, unless by the judgment of his peers or the law of the land[]"); *see also Chambers v. Mississippi*, 410 U.S. 284, 302 (1973) ("[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense[]"); *Dickerson v. Commonwealth*, 174 S.W.3d 451, 471 (Ky. 2005) (recognizing the accused's right to present a defense).

Burdette contends that assuming the jury followed the trial court's admonition, which the law presumes it would, it could not infer from the evidence that his conduct was anything but wanton, which he claims prejudiced him. *See Mayo v. Commonwealth*, 322 S.W.3d 41, 55 (Ky. 2010)

("[a]n admonition is presumed to cure the improper comments, and a jury is presumed to follow such an admonition[]"). Burdette also argues that the trial court violated the long-standing rule that counsel is afforded wide latitude during closing arguments. *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010).

The law is clear that during closing arguments, counsel is permitted to "discuss the facts proved, draw reasonable deductions therefrom, and may attack the credibility of witnesses where his remarks are based on facts appearing in the evidence." *Woodford v. Commonwealth*, 376 S.W.2d 526, 528 (Ky. 1964). Here, Burdette's statements were already admitted into evidence and defense counsel was permitted to try and convince the jury to draw certain inferences therefrom. Thus, the trial court erred in its legal reasoning for prohibiting defense counsel from making inference from the evidence. We are also troubled by the trial court interjecting itself into the trial twice by *sua sponte* objecting to defense counsel's remarks, without any objection raised by the Commonwealth. Such interference by the trial court was unnecessary and improper. Still, considering that the evidence presented at trial overwhelmingly showed Burdette's conduct was wanton, beyond a reasonable doubt, we are compelled to find the trial court's error harmless beyond a reasonable doubt. The evidence clearly proved that: while impaired and watching pornography, Burdette crashed into Det. Mengedoht's vehicle, which had its flashing lights activated, hardly applying his brakes. Given this overwhelming evidence, we find the trial court's error to be harmless beyond a reasonable doubt. *See*

46

*Dunlap v. Commonwealth*, 435 S.W.3d 537 (Ky. 2013) (holding that to be deemed harmless, preserved constitutional errors must be shown to be harmless beyond a reasonable doubt), *abrogated on other grounds by Abbott, Inc. v. Guirguis*, 626 S.W.3d 475 (Ky. 2021).

### III.    Conclusion

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

All sitting.  All concur.

COUNSEL FOR APPELLANT:

Christopher Barrett Thurman
Louisville Metro Public Defender

COUNSEL FOR APPELLEE:

Daniel J. Cameron
Attorney General of Kentucky

Christopher Henry
Assistant Attorney General